Chawa See
Inmate # G23104
C7-122
High Desert State Prison
P.O. Box 3030
Susanville, Ca 96127

In Pro Per

FILED

NOV 17 2010

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

In the District Court
For the Eastern District of California

Chawa See,
        Petitioner,

v.

M.D. McDonald,
        Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:10-cv-01520-AWI-JLT

TRAVERSE

Petitioner Chawa See, By way of Traverse To Respondent's Answer, alleges as follows:

1.- Petitioner admits that his is in custody as stated by Respondent. However, Petitioner contends that his custody is "UNLAWFULLY" for the reason set forth herein and in the petition for Writ of Habeas Corpus and supporting exhibits.

2.- Petitioner agreed as to paragraph 2 in the answer.

3.- Petitioner agreed as to paragraph 3 in the Answer.

4.- Petitioner acknowledged to paragraph 4 in the Answer.

5.- Petitioner, disagrees to paragraph 5 of the Answer, and contends that he is entitled to relief on the following grounds, as set forth in the Petition:

Ground one: The court abused its discretion and denied appellant due process of law when it excused juror 9 prior to jury deliberation.

Ground two: The presentation of an excessive number of gang incidents denied a fair trial and due process of law, and in Chawa See's case was particularly because his prior bad acts of being a minor in possession of a gun in his room at age fifteen and of making "terrorist threats" when he was fourteen years old lack any reasonable nexus to gang activity and were unnecessary, cumulative, and highly likely to be prejudicial.

Habeas relief, including but not limiting to an evidentiary hearing, should be granted, for the reasons set forth in the Petition and in the "Points and Authority" in support of the Traverse.

## Statement of the Case

Petitioner agrees to Respondent's "statement of the Case" in the Answer.

## Statement of the Facts

Petitioner will make his own "Statement of the Facts" in Points and Authorities.

Admitted that the AEDPA controls the disposition of the case. However, Petitioner contends that the state court denial of his Habeas Corpus claims are contrary to, and results from an unreasonable determination of, clearly established law as promulgated by the U.S. Supreme court; and are the product of an unreasonable determination of the facts.

Wherefore, Petitioner respectfully requests, that an evidentiary hearing be granted on grounds 1 and 2, that the court grants the writ of Habeas corpus, and all other appropriate relief.

EXECUTED ON: November 8, 2010

Respectfully Submitted,

Chawa See

PROOF OF SERVICE BY UNITED STATES MAIL

(Code of Civil Procedure, Section 1015)

(28 U.S.C. Section 1746)

CASE NO: 1:10-CV-01520-AWI-JLT

I, **Chawa See**               , declare, depose and say, the following statement is true and correct under penalty of perjury according to the laws of the State of California based on matters known to me personally to be true:

1)    I am over the age of eighteen years, a resident and prisoner of the State of California with a present mailing address of: High Desert State Prison, P.O. Box 3030, Susanville, CA 96127-3030.

2)    On this **8**, day of **November**        , 20**10**, I caused a true and correct copy of the following, specifically described document(s) to wit:

    " **Traverse** "

at the prison to be placed in a sealed envelope(s), with First Class postage having been placed thereon, fully addressed to the interested person(s) described hereinafter, back of the envelope(s) signed and dated by a Correctional Officer and then deposited such envelope(s) in the prisons internal legal mail system for processing and delivery to the United States Postal Service, for delivery to the addressee(s):

Office of the CLERK
United States District Court
Eastern District of Cali.
2500 Tulare, Street,
Suite 1501
Fresno, Ca 93721

3)    I declare that there has been regular U.S. mail pick-up by the Correctional Officers at the prison where I posted the envelope(s) that are described above, and regular communication by mail between the place of mailing and the place(s) so addressed.

    Executed this **8**, day of **November**        , 20**10** under penalty of perjury according to the laws of the State of California, in Lassen County, City of Susanville.

Declarant

Chawa See
Inmate # G23104
C7-122ᵘ
High Desert State Prison
P.O. Box 3030
Susanville, Ca 96127

In Pro Per

### In the District Court
### for the Eastern District of California

Chawa See,
    Petitioner,

V.

M.D. McDonald,
    Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:10-cv-01520-AWI-JLT

POINTS AND AUTHORTIES IN SUPPORT OF TRAVERSE

# Table of Contents

Table of Authorities _____ i,ii

Statement of Facts _____ 1

Argument I                                                          3

The court abused its discretion and denied appellant due process of law when it excused juror 9 prior to jury deliberation, _____ 3

Argument II                                                         11

The presentation of an excessive number of gang incidents denied a fair trial and due process of law, and in Chawa See's case was particularly because his prior bad acts of being a minor in possession of a gun in his room at age fifteen and of making "terrorist threats" when he was fourteen years old lack any reasonable nexus to gang activity and were unnecessary, cumulative, and highly likely to be prejudicial. ___ 11

Conclusion. _____ 19

# Table of Authorities
## Federal Cases

Bayramoglu v. Estelle (9th Cir. 1986) 806 F.2d 880,887 — 3,9
Crist v. Bretz (1978) 437 U.S. 28,35-36 — 5
Dennis v. United States, (1950) 339 U.S. 162 — 3
Duncan v. Louisiana (1968) 391 U.S. 145,148 — 3,9
Irvin v. Dowd (1961) 366 U.S. 717 — 3,9
Irvin v. Dowd (1961) 366 U.S. 717,722, 6 L. Ed. 2d, 751, 81 S.Ct. 1639 — 3,9
Jackson v. Virginia (1979) 443 U.S. 307,317,320 — 17
Kimmelman v. Morrison (1986) 477 U.S. 365,374[91 L.Ed. 2d, 305,318-319, 106 5.Ct 2574 — 18
Lockhart v. Fretwell (1993) 506 U.S. 364, 113 5.Ct. 838, 845 — 19
Old Chief v. United States (1997) 519 U.S. 172[117 5.Ct. 644 — 5
Perez v. Marshall (9th Cir. 1997) 119 F.3d 1422,1426 — 3,9
Rivera v. Illinois (2009)__.U.S.__[129 5.Ct. 1446 — 5
Smith v. Phillips (1972) 455 U.S. 209,217 — 3,9
Stanclen v. Whitley (9th Cir. 1993) 994 F.2d 1417,1423 and Nelson, J. Concurring at 1426 — 18
Strickland v. Washington (1984) 466 U.S. 668,688,694 [80 L. Ed. 2d 674,693,698, 104 .5.Ct, 2052 — 19
United States v. Moccia (1st Cir. 1982) 681 F.2d. 61,63 — 14
United States v. Reid (1852) 12 How. 361,366 — 3

## State Cases

College Hospital, Inc. v. Superior Court (1994) 8 Cal. 4th 704,715 — 18
Ewoldt, supra, 7 Cal. 4th at pg. 405-406 — 15
Ghilotti v. Superior Court (2002) 27 Cal. 4th 888,918 — 18
In re Contreras (1952) 109 Cal. App. 2d 787,789 — 15
In re Hamilton (1999) 20 Cal. 4th 273,296 — 9
People v. Abbott (1956) 47. Cal. 2d 362,370-371 (cited at opp.22) — 3,5
People v. Abbott (1956) 47. Cal. 2d 362,371-372 — 3,5
People v. Anderson (1978) 20 Cal. 3d 647,650 — 12
People v. BAKER (1979) 94 Cal. App. 3d 321,333-334 — 12
People v. Barber (1988) 200 Cal. App. 3d 378,394 — 6
People v. Barnwell (2007) 41 Cal. 4th 1038,1052 — 6
People v. Barnwell (2007) 41 Cal. 4th 1038, 1052 [63 Cal. Rptr. 3d 82,162 P.3d 596] — 7
People v. Benavides (2005) 35 Cal. 4th 69,90 — 13
People v. Brit (2002) 104 Cal. App. 4th 500,505 — 14
People v. Bryden (1998) 63 Cal. App. 4th 159,183 — 12
People v. Burgener (1986) 41 Cal. 3d 505,525-526 — 12
People v. Cleveland (2001) 25 Cal. 4th 466,484 — 5
People v. Cleveland (2001) 25 Cal. 4th 466, 474 [106 Cal. Rptr. 2d. 313,21 P.3d 1225 — 6
People v. Compton (1971) 6 Cal. 3d 697,696 — 5
People v. Cottle (2006) 39 Cal. 4th 246,257 — 5
People v. Duran (2002) 97 Cal. App 4th 1448,1459 — 12
People v. Ewoldt (1994) 7 cal. 4th 380,404 — 13
People v. Ewoldt (1994) 7 cal. 4th 380,405 — 14
People v. Franklin (1976) 56 Cal. App. 3d 18, 26 — 5
People v. Haston (1968) 69 Cal. 2d 233,244 [70 Cal. Rptr. 419,444, P.2d 91 — 15
People v. Hecker (1990) 219 Cal. App. 3d 1238 (opp.22) — 3

State Cases (continued)

People v. Hecker (1990) 219 Cal. App. 3d 1238, 1242-1245 — 6

People v. Henry (1972) 22 Cal. App. 3d 951, 956, fn. 3 — 18

People v. Hernandez (2003) 30 Cal. 4th 1, 10-11 — 5

People v. Hernandez (2004) supra, 33 Cal. 4th [1040] at. pp. 1050-1051. — 16

People v. Johnson (1980) 26 Cal. 3d 557, 577, 578 — 17

People v. Kelly (1992) 1 Cal. 4th 495, 523 — 13

People v. Leon (2008) 161 Cal. App. 4th 149 — 12

People v. Leon (2008) 161 Cal. App. 4th 149, 168 and 169 [73 Cal. Rptr. 3d 786] — 15

People v. Lewis (2001) 25 Cal. 4th 610, 637 [106 Cal. Rptr. 2d 629, 22 p.3d 392] — 13, 15

People v. McPeters (1992) 2 Cal. 4th 1148 — 3

People v. McPeters (1992) 2 Cal. 4th 1148, 1174,-1175 — 7

People v. Medina (1995) 11 Cal. 4th 694, 748 [47 Cal. Rptr. 2d 165, 906 p.2d 2.] — 15

People v. Morrison (2004) 34 Cal. 4th 698, 724 — 16

People v. Ray (1996) 13 Cal. 4th 313, 342 -343 — 7

People v. Reyes (1998) 19 Cal. 4th 743 — 12

People v. Rollo (1977) 20 Cal. 3d 109, 119 — 13

People v. Rowland (1992) 4 Cal 4th 238, 260 [14 Cal. Rptr. 2d 377, 841 P.2d 897.] — 15

People v. Sengpadychith (2001) 26 Cal. 4th 316, 324 — 12

People v. Thompson (1980) 27 Cal. 3d 303, 315 [165 Cal. Rptr. 289, 611 p.2d 883.] — 15

People v. Wallace (2008) 44 Cal. 4th 1032, 1086 -1087 — 8

People v. Watson (1956) 46 Cal. 2d 818, 837 — 18

People v. Wheeler (1978) 22 Cal. 3d 258, 266, 277 — 5

People v. Wheelwright (1968) 262 Cal. App. 2d 63, 71 — 18

People v. Williams (2009) 170 Cal.App. 4th 587, 610 -611 — 14, 15

People v. Wilson (2008) 44 Cal. 4th 758, 821, 830, Emphasis added — 7, 8

People v. Wilson, Supra, 44 Cal 4th 758, 819 -820 [Wilson] — 9

People v. Yeoman (2003) 31 Cal. 4th 93, 162 — 10

People v. Zamudio (2008) 43 Cal. 4th 327, 349-350 — 6

## Federal Constitutional Provision

U.S. Const., Amend; VI; Cal. Const. art. 1, 16 — 3, 5, 9

Sixth Amendment — 3, 9, 5

## California Statutes

Penal Code 1089 — 3, 4

Code Civ. Proc. 229 — 3

Evidence Code Section 352 — 11, 13, 14

Section Code 182.66, Subdivision (b)(1) — 13

Evidence Code Section 350 — 13

Evidence code Section 210 — 13

186.22, sub.d. (e) — 16

## Statement of the facts

On October 1, 2006, at around 6:30 p.m., before sunset, sixteen years old Robert Trevino, the homicide victim, was engaged with others in throwing the football in the street near his home. Trevino lived near a street oval area known to be dominated by the Oriental Troop gang; however, he was a Norteno gang member. (1RT 93, 108-109, 123, 3RT 577-573, 4RT 644-646.)

According to Billy Her, an Oriental Troop member, he overheard a conversation between fellow gang members Jack Noi and fifteen year old Chawa Sge. Noi related that Trevino had some sort of problem with Noi while both Noi and Trevino were in Juvenile Hall, and Chawa had said he would take care of it. (2RT 249-251, 3RT 620, 4RT 642-643.)

Her testified to his ignorance of anything violent about to happen or the presence of a gun, rather the group he was with had been having beers and marijuana until his mother kicked them out and they were bored, causing them to start out for another location on a path which led them through where Trevino was playing ball. (2RT 257-302) The group was Her, Lavang, Aitang, Chawa, and Chawa's younger brother Mouseng.

As the group approached those playing football, the little brother of Jose Robolledo, a neighbor, ran into the house saying they were going to be shot. Robolledo looked long enough to see five Asian males, two of them whom had black masks and two of whom had blue masks. One had a dark object like a gun in his waistband. Robolledo grabbed his son and took cover by the refrigerator. His mother called 9-1-1. (1RT 92-103.)

Maribel Saucedo was another neighbor. Someone told Trevino to come to where they were, but he declined. The group went up to Trevino. Saucedo heard a shot and saw the group run toward Houston Street and Trevino on the ground. (1RT 109-121) Angela Trevino was the grandmother and adoptive mother of the sixteen year old victims. She was inside when her granddaughter ran in and reported Robert Trevino was shot. She ran out, but he died before she could call 9-1-1. (1RT 122-126.)

One of those who had been playing football with Trevino was David See. (1RT 126.) He recognized Her, Chawa, and another person in the group. Her was not wearing a mask. (1RT 126-186.) From what David See observed, either Chawa or Lavang shot Trevino. (1RT 185.) Sergeant Sumpter showed him photographs, and David See identified all the defendants and Her as being present. The shooter was not Aitang or Her, but he thought either LaVang or Chawa was the one who shot Trevino.

According to Her, the shooter was Chawa. Her disclaimed prior knowledge and disclaimed that his act in shaking Trevino's hand was to distract him. (2RT 240-242, 262-253, 257.) Angel Gonzales, aged nine years at the time of trial saw the group approach her uncle and saw a man who shook her uncle Robert's hand show a finger behind his back, at which point someone shot Robert. (2RT 308-312.) She identified the facial bandanas as Red and white. (2RT 312-314.)

When officer Thompson arrived at the scene few minutes later, the victim was laying part on the sidewalk and part in the street and exhibited no sign of life. (2RT 316, 320.) Dr. Gary Walter later established the cause of death as a gunshot wound to the head. He recovered the bullet. (3RT 509) The bullet was fired from a gun found October 6, 2006, under a mattress in the Southeast bedroom of Chawa's family's house. Chawa was not present. (3RT 527-528, 3RT 430, 434-435, 437-438.)

During the defense portion of the case, Mouseng explained the gun's presence: Mouseng was a member of Billy Her's admitted gang, the MB gang, and Her brought the gun to him to hide, which he did in his bedroom. (4RT 766-770.) He told the police that the room was not his because he did not want to go to jail for murder. (4RT 770.) The prosecution in cross-examination and surrebuttal attacked Mouseng's credibility. (4RT 765-794.)

None of the defendants were arrested at home. Tawny Chamberlain, fifteen years old at the time of the trial two years after the homicide, cooperated with Sumpter in a manner permitting the arrests of Aitang by Sergeant Esquibel on October 6, LaVang on October 17, and Chawa on October 18. Her fled the state and was arrested more than a year later. (3RT

1.

441-449, 451.) Chawa had been staying at the home of Duang See for a few days before his arrest. (3RT 451-459, 506-507.) At booking, Chawa stated he was an Oriental Troop member (3RT 464.)

Tawny Chamberlain provided a statement to Sergeant Sumpter on October 18, 2006, in which she told the sergeant that prior to Chawa's arrest she asked him why he did it and that Chawa replied Trevino deserved it and was disrespectful of the area. (2RT 390.) However, she made the the statement because she was angry. She was about to give birth to her baby. The approximately thirteen year old had been pregnant by Lavang, but neither Lavang nor Chawa cared. Chawa knew the baby was due (it was born a few days later), but when she asked him why he did it he told her it was none of her business. (2RT 387, 390-393.)[12] She lied about Chawa saying he had shot someone. She had a baby coming, and he did not care. She should have not done so, but she did. (2RT 395-396.) On April 8, 2008, a couple of days before her testimony at trial, she reported to the district attorney's office that her statement was false and asked that a new report be prepared noting that. (2RT 405-406.) She admitted she knew alot of members of the Oriental Troop. (2RT 397, 400.) She denied insinuations that the defense attorneys had led her to lie or that she had been threatened. She did not deny having initially made the statements, but they were lies. (2RT 397, 400, 402-404.)

---

12. Tawny also testified that the police would not leave her alone, she was pregnant, there was no suggestions her baby might be taken from her, and she did not need that kind of stress, so she said what she said. (2RT 395, 397, 399.) An investigator from the district attorney's office testified to speaking to her when she retracted her statement on April 8, 2008, and to her saying she was frightened and did not want to be a snitch. She saw members of the gang everyday, and they had been at her house and held her baby. She did not want to testify. (3RT 426-427.)

# ARGUMENT I

The court abused its discretion and denied appellant due process of law when it excused juror 9 prior to jury deliberation.

Removing a sitting juror is not the same as issuing a challenge for cause during selection. (Compare Pen. Code 1089 [grounds for removal], with Code Civ. Proc. 229 [grounds for cause].) In any event, teaching in a school where a relative of a defendant attends other classes is not sufficient in itself to sustain a challenge for cause. (See Code Civ. Proc. 229) There was no misconduct, so People v. Abbott (1956) 47 Cal. 2d 362, 370-371 (cited at opp. 22) is inapposite. The juror here was ready, willing, and able to serve, and the juror's stated ability to be fair renders People v. Hecker (1990) 219 Cal. App 3d 1238 (opp. 22) inapposite as well. In contrast, People v. Ray (1996) 13 Cal. 4TH 313, 342;343 [guidance counselor at school victim's daughter attended] and People v. McPeters (1992) 2 cal. 4TH 1148 [failure to acknowledge knew potential witness who was victim's husband] confirm the dismissal here was incorrect. Such dismissal implicates the Sixth Amendment right to a jury as well. (See Perez v. Marshall (9TH Cir. 1997) 119 F. 3d 1422, 1426; See also Bayramoglu v. Estelle (9TH Cir. 1986) 806 F. 2d 880, 887, citing Duncan v. Louisiana (1968) 391 U.S. 145, 148; Irvin v. Dowd (1961) 366 U.S. 717.

The judge found juror 9 wanted to remain on the jury and to do her duty and was not going to let anything affect her ability to be fair and impartial (4RT 846), but he later discharged her because he felt it was asking too much as a society since she was [sic-had been] the teacher of a person closely watching and involved in the case. (4RT 924, 926) That is not a ground for removal (Pen. Code 1089), nor is it even reasonable or appropriate to remove a juror for that reason. "[I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote" (Smith v. Phillips (1982) 455 U.S. 209, 217.) In this case the juror denied any actual influence on fairness. As reiterated in Smith v. Phillips, supra, the Federal Supreme Court "said in Dennis v. United States, 339 U.S. 162 (1950), [one] may not know or altogether understands the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter.' Id., at 171, See also United States v. Reid, 12 How. 361, 366 (1852).'' (Smith v. Phillips, supra, 455 U.S. 209, 217 fn 7.)

Before swearing in the jury, the court asked if any of the potential jurors had anything else to tell the court and parties. (Aug. CT 282). No potential juror responded. (IBID)

During jury instructions, Juror 9 asked to speak with the court. (4RT 806) She related that she knew Chawa's family and had taught his sister, Nalae. (4RT 806-807.) She first realized that Chawa was Nalae's brother after Mauseng testified. (4RT 807, 844, 846) While the situation affected her heart and would make her feel badly, it would not influence her vote. (4RT 808-809, 812). Juror 9 had not met other members of Chawa's family. (4RT 809). Although all of the jurors were worried about gang retaliation, she was not afraid to vote guilty if the evidence so warranted. (4RT 816)

Following jury instruction, the court and counsel discussed the situation. THE district Attorney asked the court to discharge Juror 9. (4RT 843) Although Juror 9

3.

indicated that it wouldn't affect her opinion of the case and that she wouldn't be afraid, the prosecutor questioned her sincerity since he had established that the OT was a deadly gang. (4RT 843-844)

The court decided to let juror 9 remain. It stated:

"Actually if I was convinced that she was somehow prejudiced in some way and that she was not sincere, I would kick her immediately. But I was... I was convinced of her sincerity the more she talked that she wanted to do her duty, remain on the jury, and that she was not going to let anything affect her ability to be fair and impartial. That's the impression I got from her. She stumbled on her words a little bit, and I think it might have been because obviously English was not her first language. But she seemed to want to stay on, but she said she would leave it up to the experts, which is what she called us, and I'm not convinced she can't be fair, so I'm going to leave her on the jury at this point in time." (Ibid)

The trial court changed its mind after closing arguments. The court discharged juror 9 and told her:

"... as I thought about this during the arguments, my feelings is we may be putting an undue burden on you, since you're actually the teacher of somebody thats closely watching and involved in the case, and I don't know that it's fair that we do that, so Im going to excuse you from this trial. I know that you've stated that you can be fair and I believe maybe you well can, but its just when somebody had a relationship like that on a case like this, I think we're asking too much of the juror to set that aside and ignore it all and try to be objective. I think we're just asking too much of you to do that." (4RT 924)

Although not finding the juror incapable or disqualified, at the end of the instructions and following arguments by counsel, the court excused juror 9 on a the basis that society should not place a person in a situation where they might have to face a relative of one they found guilty and if juror 9 alternatively were to vote not guilty there might be an unspecified perception by unspecified persons of bias.

Appellant asserts that after the court determined that juror 9 could be fair, speculation about potential fallout from juror's decision is not good cause for discharge. (Pen. Code 1089).

A. Worries about the perception of the fairness of Juror 9's verdict is not good cause for discharge.

I. The Statute

Penal Code section 1089 limits the circumstances under which a trial court may discharge a juror and provides in relevant part:

"If at any time, whether before or after final submission of the case to the jury, a juror dies or become ill, or upon other good cause shown to the court is found unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be submitted to the same rules and regulations, as though he had been selected as one of the original jurors." (Ibid)

Thus in the present case, the statute permitted the discharge of juror 9 only if there was good cause that the juror was unable to perform her duties. A "[T]he trial court has at most a limited discretion to determine that the

4.

acts show an inability to perform the functions of a juror." (People v. Compton (1971) 6 Cal. 3d 687, 696.) A trial court's ruling will be reversed if it "cannot withstand scrutiny under the precise language of section 1089" (People v. Compton, supra, 6 Cal. 3d at p. 60.) Accordingly, the purported good cause must be such that it "actually renders [the juror] 'unable to perform his duty.'" (Id. at p. 59.) "The court must not presume the worst". (People v. Franklin (1976) 56 Cal. App. 3d 18, 26.) No such showing was made in the present case.

The first twelve pages of Respondent's brief consist mainly of quotations from the record. His discussion begins at AG 32.

The Attorney General begins with his primary point, "First and foremost even assuming the court erred in excusing juror number nine, appellant have not shown prejudice." (AG 32) His argument is that there is no right to the particular twelve jurors who are sworn to try the case, and hence any juror can be removed for any reason — or possibly for no reason at all — without prejudice so long as there is an alternate to take that juror's place. Thus, in effect, jurors can be removed at will. There may be an error in doing so, but it is unenforceable and without an effective remedy.

California in particular has made accomodations to change its prior law which did not permit alternates. However, the above proposition goes so far beyond that as to on its face appear incorrect.

The unity of the juror aside, the fact is that alternates are not a part of the "jury." "the Legislature set forth separate requirements for alternate jurors and gave the court discretion whether to select alternates at all. The distinct treatment demonstrates that a "jury" does not include alternate jurors. (See Code Civ. Proc., 233, 234; Pen. Code, 1089.)" (People v. Cottle (2006) 39 Cal. 4TH 246, 257.) "[T]he Legislature intended that a trial jury be comprised of 12 jurors sworn by the court 'to try and determine by verdict ... questions of facts', regardless of whether alternate jurors are to be called, selected, and sworn. Once a jury has been sworn, the court lacks authority to reopen jury selection proceedings." (People v. Cottle, supra, at p. 258.)

Respondent's proposed procedure effectively permits that which the Legislature has prohibited. While the court may substitute an alternate to replace a juror excused for statutory "good cause"; (Ibid) there is no power to do so where the excuse is not for good cause. Doing so simply compounds the error.

Further, the "jury" is the trial jury sworn, not alternates, and the defendants has a right to a trial by jury (U.S. Const., Amend. VI; Cal. Const., art. 1, 16) and an interest in that jury being his chosen tribunal. (Crist v. Bretz (1978) 437 U.S. 28, 35-36.) That interest may be served for double jeopardy purposes by use of an alternate even in situations where the juror was improperly discharged. However, improper discharges are treated as PREJUDICIAL legal errors rather than as a bar to further prosecution. (People v. Hernandez (2003) 30 Cal. 4TH 1, 10-11.)

An improper discharge of a juror requires reversal. (People v. Cleveland (2001) 25 Cal. 4TH 466, 486 [error is prejudicial and requires reversal of the judgement].)

Respondent's citations to cases dealing with peremptory challenges (People v. Wheeler (1978) 22 Cal. 3d 258, 266, 277; Rivera v. Illinois (2009) ___ U.S. ___ [129 S.Ct. 1446]) are clearly inapposite. These involve situations before the jury is chosen and sworn. Similarly, In re Hamilton (1999) 20 Cal. 4TH 273, 296, deals with presumptions arising where there is a claim of juror misconduct. People v. Abbott (1956) 47 Cal. 2d

5.

362,371-372, actually dealt with whether the defendant had to be present in the chamber for the discussion on discharging the juror, and to the extend the Supreme Court spoke to the discharge itself, if there was no error, so the question of prejudice from an improper discharge never arose.

Respondent does attempt to justify dismissal of the juror. He again relies on Abbott, supra, noting that the juror worked at a desk twenty-five feet away from the defendant's brother in the same office. Thus, although it is not at all clear that the courts remarks in Abbott were dressing an issue in the case at all, the situation in that case is not comparable. The juror in Abbott was a co-worker located in the same office within a close distance, and neither would be able to ignore each other. Here, the juror was not in a current personal relationship to the sister other than having taught her in the past. They were not forced together in the same room but were in the relative anonymity of a school setting.[3] They were not co-equals or co-workers. It simply would make no significant difference to them if they were some degree of awkwardness on campus.

Respondent seems to be aware that the judge here articulated his thoughts but nonetheless speculates there might have been something more. (AG 34, citing People v. Zamudio (2008) 43 Cal. 4th 327, 349-350; and c.f. People v. Hecker (1990) 219 Cal. App. 3d 1238, 1242-1245.) However, as respondent commendably also acknowledges, the disqualification must appear as a demonstrable reality in the record. (AG 33, citing People v. Barnwell (2007) 41 Cal. 4th 1038, 1052.) Regrettably, a few pages later, respondent also states that appellant have used wrong standard in this regard. Respondent's view on the matter appears to be that the basis of the court's decision must appear factually on the record as a demonstrable reality but as long as the facts appear, then the appellant review is at an end, as long as the reason for discharge is "reasonable". Since there was no dispute juror 9 was a teacher at Chawa's sister's school and "should be" none as to whether juror 9 would see her every day, the "demonstrable reality" prong is satisfied, and the only question is whether the trial court's decision was "reasonable." (AG 35-36.)

First, there was no dispute that juror 9 was a teacher at the school. Also no factual findings on the record that juror 9 had a "personal relationship" with Chawa's sister. There is some dispute about whether juror 9 would see the girl "everyday", although the teacher would inferentially see her around the school generally. But again restated that there was no factual findings on the record of any "personal relationship" between juror 9 and Chawa's sister.

But, second, respondent's view of the review standard seems to be a mish-mash that confabulates a basis for the facts with a showing that the juror is legally unable to serve in that function. The California Supreme Court, however, has sought to emphasize clarity;

"Although we have previously indicated that a trial Court's decision to remove a juror pursuant to section 1089 is reviewed on appeal for abuse of discretion, we have since clarified that a somewhat stronger showing than what is ordinarily implied by that Standard of Review is required. Thus, a juror's inability to perform a juror must be shown as a 'demonstrable reality.' (People v. Cleveland (2001) 25 Cal. 4th 466, 474 [106 Cal. Rptr. 2d 313, 21 P.3d 1225]), which requires a 'stronger. . . . .

---

3. Although apparently it is not felt to be ground for a challenge for cause, appellants notes "Peremptory challenges are often exercised against teachers by prosecutors on the belief they are deemed to be rather liberal."

(People v. Barber (1988) 200 Cal. App 3d 378, 394.)

6.

evidentiary showing than mere substantial evidence" (Id. at p. 488 (conc. opn. of Werdegar, J.)). As we recently explained in People v. Barnwell (2007) 41 Cal. 4TH 1038, 1052 [63 Cal. Rptr. 3d 82, 162 P.3d 596]: "To dispel any lingering uncertainty, we explicitly hold that the more stringent demonstrable reality standard is to be applied in review of juror removal cases. That heightened standard more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury." (People v. Wilson (2008) 44 Cal. 4TH 758, 821, emphasis added.)

Deference is given to factual findings, but not to whether the juror's inability to perform as a juror is shown as a demonstrable reality. "Applying these rules to the facts of this case, while giving full deference to the trial court's factual findings, we conclude the evidence does not show to a demonstrable reality that Juror No. 5 was relying on facts not in evidence or that he was otherwise unable to fullfill his oath and duty as a juror (1089)" (People v. Wilson, supra, 44 Cal. 4TH 758, 830)

    B. The prosecution did not show by a Demonstrable Reality that Juror 9 was unable to perform her duties.

Juror 9 repeatedly stated that she could be fair and the **court** believed her. The court indicated that it was not swayed by the district attorney's position, but believed only that others might belatedly question the verdict. These are insufficient justifications to excuse a juror. (4RT 924-926.)

In People v. Ray (1996) 13 Cal. 4TH 313, the California Supreme Court held that the fact that one of the jurors was a guidance counselor at a school that the victim's daughter attended did not reveal a sufficient potential for bias to trigger an investigation. (Id. at pp. 342-343.) Ray was convicted of murder attempted murder and Robbery and sentenced to death. Just before the court instructed the jury, it received a note from juror Ruggles stating that the daughter of the attempted murder victim was a senior at the high school where he worked. Ruggles never had discussed the case with the daughter and although he was familiar with the victim's surname, he didn't recognize the connection until the victim testified. (Id at p. 342.) On appeal, the defense contended that the trial court had a duty to inquire whether good cause existed to excuse the juror. (Id. at 343).

Our Supreme Court disagreed and cited, People v. McPeters (1992) 2 Cal. 4TH 1148, 1174-1175, the Ray Court held that "[A] juror who is acquainted with the victim's family as the result of a business or professional relationship is not necessarily incompetent to serve in a capital case." (Id. at 344.) The court found that no evidence indicated that Ruggles had **developed** a special relationship with the daughter or had worked with her at school. Furthermore had the juror formed improper opinions about the case favoring the prosecution, the court thought it likely that the juror would have remained silent. The fact that the juror came forward voluntarily supported the conclusion that his failure to mention the information earlier was inadvertent, and that he was attempting to perform his duties in good faith. No further inquiry was needed. (Id. at p. 344.)

The only difference between the present situation and that presented in Ray, was that Juror 9 had taught Chawa's sister. Accordingly, the trial court in

the present case properly inquired into Juror 9's ability to remain impartial, but once it determined that she could, it should have permitted Juror 9 to remain on the jury because the prosecution did not demonstrate that Juror 9 was unable to perform her duties.

The holdings in People v. McPeters, supra, 2 Cal.4TH 1148[McPeters]"[16] and People v. Wilson, supra, 44 Cal.4TH 758 ["Wilson"] support this conclusion.

McPeters was convicted of the first-degree murder of Linda Pasnick that occured during the robbery or attempted robbery of a fast food restaurant. He was sentenced to death. During jury voir dire, Juror House did not admit to knowing the victim's husband, Victor Pasnick, a potential witness. Prior to opening statement, House informed the court that he was in the process of buying a house and he might know Victor who he thought represented the sell. Further investigation revealed that Victor had represented the seller and House had had three conversations with him.

Responding to the court's question:

House stated that he had not discussed the case with Pasnick, and, although he thought highly of Pasnick and initially felt this might affect his judgement, he affirmed his ability to be objective and stated he would assume Pasnick's credibility was equal to that of any other witness. (Id. at p.1174.)

Defendant asked for House's removal, however, the trial court found that House held no express or implied bias. Our Supreme Court agreed and held that a juror's inadvertent failure to disclose information does not mandate discharge of the juror. House's affirmed that he could be impartial and his candid disclosure supported the trial court's decision to permit House to remain on the jury. Therefore, neither the defendant's Sixth Amendment rights to an impartial jury nor his statutory rights pursuant to Penal Code section 1089 were violated.

The same is true in the present case. Juror 9 voluntarily disclosed the contact and stated that she could be fair and impartial even if it cause her some discomfort. Like House, Juror 9 should have permitted to serve.

Although the potential for bias was greater in Wilson, Supra, 44 Cal.4TH 758 than the present case, the California Supreme Court held that the trial court erred in dismissing a juror during the penalty phase and that error required reversal of the penalty phase judgement. Wilson was a capital case in which the defendant was African-American and one African-American person — Juror 5 — sat on the jury. The jury convicted the defendant of first degree murder and forcible rape. During the penalty phase, Juror 5 first voted for the death penalty, but later held out for a life sentence.

Juror 1 reported to the court that Juror 5 had engaged in misconduct by basing his verdicts on facts not in evidence, and by deciding that he could not sentence the defendant to death for reasons that the other

---

16. Superseded by statute on other grounds. (People v. Wallace (2008) 44 Cal.4TH 1032, 1086-1087.)

8.

jurors, who were not Black would not understand.(Id. at p. 816.) Juror 1 claimed that Juror 5 had stated,"If this guy came from a good family - had a college education then I'd say, "burn him". But Black people don't admit being abused[.] It's a father-son thing. You can't understand - you're not Black."(Ibid)

After questioning Juror 5, the trial court concluded that Juror 5 had concealed his racial biases during voir dire and therefore, no party challenged or excused him.(Id. at 817.) The trial court found true that juror 5 had told others on the jury that they couldn't understand because they weren't Black. The trial court found that Juror 5 could not disentangle his race-based assumptions from those not involved on race.(Id. at 818-819.) In addition, the court found that Juror 5 prejudged the appropriate penalty, failed to follow the court's instructions and relied on facts on in evidence. (People v. Wilson, supra, 44 Cal. 4TH 758, *819-820.) The trial court excused the juror.(Id. at 820.)

Our Supreme Court disagreed and held that the evidence or Juror 5's unintentional concealment of any racial biases did not establish a demonstrable reality that he was unable to perform his duties.(Id. at 824.) In addition, the Supreme Court decided that the juror relied on his own life experience rather than extraneous facts to interpret the evidence presented.(Id. at 825, 830-831.)

Giving differences to the trial court's ability to judge the credibility of witnesses and finding it likely that Juror 5 stated that life imprisonment was a more severe penalty than death, our High Court held that the statement was insufficient to satisfy the demonstrable reality test.(Id. at 835.) Finally, the court found that Juror 5 did not prejudge the case as evidenced from the jurors vote of guilty to murder, kidnapping and tortue and his initial decision to vote for the death penalty.(Id. at 840-841.) The court reversed the penalty phase judgement without showing of a prejudice.

Appellant has a federal constitutional right to an impartial jury. Bayramoglu v. Estelle (9th Cir. 1986) 806 F. 2d 880, 887 citing Duncan v. Louisiana (1968) 391 U.S. 145, 148 (Sixth Amendment right to a jury trial); Irvin v. Dowd (1961) 366 U.S. 717, 722; 6 L. Ed. 2d. 751, 81 S. Ct. 1639 (due process right to trial by impartial jury.) The Sixth Amendment is implicated when a trial court erroneously removes a juror without good cause and replace her with an alternate. (Perez v. Marshall (9TH Cir. 1997) 119 F. 3d 1422, 1426.)

"[T]he jury is a 'fundamentally human' institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution."(In re Hamilton (1999) 20 Cal. 4TH 273, 296.) It is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote, and for the system to function it must recognize that jurors are imbued with human frailties as well as virtues.(Ibid.; Smith v. Phillips (1972) 455 U.S. 209, 217[20].)

---

20. In Smith v. Phillips, supra, the prosecution failed until after the trial to inform the defense that a juror had applied with its office for a position during the trial, and the court concluded there was no denial of due process by virtue of "implied" juror bias.

9.

Simply because a juror may feel a very human sadness upon possibly encountering relatives of a person he or she found guilty is no more than a reflection of such virtues and frailties, but it is no type of disqualification envisioned by section 1089 of the Penal Code. (See also, e.g., People v. Yeoman (2003) 31 Cal.4TH 93, 162 [jurors description of family members and themselves with drugs not disqualifying].)

The judge felt empathetic toward juror 9, but the juror was able to function as a juror and the court should have respected that fact. As discussed in section A and B ante, the trial court lacked good cause to dismiss juror 9. Appellant asserts that the error affected the integrity of the trial process and was prejudicial per se. Accordingly, appellant's judgement of conviction must be reversed.

---

20 That is, one cannot impute to a juror a bias based merely upon the possible appearance of a potential awkwardness of future association.

10.

# ARGUMENT II

The presentation of an excessive number of gang incidents denied a fair trial and due process of law, and in Chawa See's cas was particularily because his prior bad acts of being a minor in possession of a gun in his room at age fifteen and of making "Terrorist Threats" when he was fourteen years old lack any reasonable nexus to gang activity and were unnecessary, cumulative, and highly likely to be prejudicial.

As pointed out, and the Court of Appeal assumes, the number of "predicate acts" was unnecessary and excessive.

The additional offenses and contacts had no probative purpose. They constituted "smoke" and inflammatory propensity and frightening evidence, but the volume simply served to obscure the issues and to encourage conviction based upon fear that these defendants and these terrifying gang activities needed to be removed from society and an example set. That is not determining the issues. It imports fear and emotions in place of reason, Considerations of public safety as a basis to decide facts are misleading and unduly time-consuming. Evidence Code Section 352 is written with a purpose to aid the fairness of the trial. Too much turns into an unfair amount that overwhelms the decision making process by pandering to emotions and matters extraneous to the issues to be decided.

## A. Predicate Offenses

1. On June 30, 2004, Chava Seechan and a few other OT members took ice cream from an ice cream truck. After the owner demanded cash, Seechan went around the corner, put a blue bandana over his face and returned opening fire on the truck. (3RT 588-590.)

2. Later that night Seechan and Aitang went into a grocery store on North Dinuba and Houston and took beer without paying. When the security guard attempted to stop them, Seechan fired at the security guard. Seechan was an OT member. He was convicted of the attempted murder of the ice cream truck driver and robbery with gang enhancements. (5RT 592-593.)

3. Aitang had a juvenile petition sustained for attempted robbery with a gang enhancement for the incident at the grocery store. (3RT 629-630.)

4. On Nov. 15, 2004, OT Roger Saesee got into an argument with Norteno Joe Fernandez over turf. (3RT 595.) Saesee shot and killed Fernandez.

5. On April 30, 2005, Norteno David Garcia was sitting in front of his house when Damrong Seechan and other Oriental Troop members approached and asked him if he banged. (5RT 598.) Seechan shot and killed Garcia. (3RT 599.) Seechan pleaded to manslaughter with gun and gang allegations. (3RT 599.)

6. Mathew Fernandez, a Norteno, and his friends were at a store when Smith Saesee and other OT member walked in. (3RT 600.) An argument led to a physical altercation. Saesee pulled out a gun and shot Fernandez and paralyzed him. (3RT 600.) Saesee was convicted of mayhem, shooting into an occupied building and assault with a deadly weapon with gang allegations. (3RT 601.)

7. On May 8, 2006, Aipio Saesee, an OT and 15-years-old female Norteno exchanged words about turf. (3RT 601-602.) Aipio left and returned with a gun. He fired at the girl's house from his car, killing the girl's sister. He was convicted of murder with a firearm and gang enhancement. (3RT 603.)

8. On March 10, 2005, Chawa was contacted with OT chalen See regarding a vehicular burglary and the theft of the car's stereo. (3RT 607-608.) A juvenile petition was sustained against Chawa for that theft. (3RT 608.)

9. On April 6, 2005, Chawa got into a disagreement with his girlfriend's family. He threatened to shoot the victims and identified himself as a person who associated with gangs (3RT 608-609.) A juvenile petition was sustained for criminal threats. (Ibid.)

11.

10. On December 20, 2005, the police conducted of probation search of Chawa's home. (3RT 610.) Chawa wasn't there, but LaVang was. (3RT 610.) A juvenile petition was sustained for possession of a gun. (3RT 610-611.)

## B. Field Contacts

1. May 7, 2005, Officer Lyon contacted Chawa and found that he had a blue bandana. (3RT 617.)
2. May 3, 2005, officer Gonzales contacted Chawa at a family disturbance and Chawa admitted being a Crip and that his moniker was C-Loc. (Ibid.)
3. March 10, 2005, Chawa was booked into juvenile hall wearing blue shoes. (3RT 619.)
4. April 7, 2005, Chawa was booked into juvenile hall wearing a blue sweater. (3RT 619.)
5. May 3, 2005, Chawa was booked wearing a blue shirt by the Visalia police. (3RT 619.)
6. December 20, 2005, he possessed a handgun. (3RT 619.)
7. Oct. 18, 2006, Chawa admitted he was an OT gang member when booked at juvenile hall. (3RT 619.)

In sum, the prosecution offered 10 predicate offenses and 7 field contacts regarding Chawa. None of the contacts were sanitized so the jury learned of the defendant's possible involvement in other crimes, arrest and violence that was speculative, unrelated to the present offense and prejudicial.

## C. The Court should have excluded many of the predicate offenses and field contacts pursuant to Evidence Code section 352.

Evidence code section 352 gives the court discretion to exclude relevant evidence when its admission will necessitate an undue consumption of time or "create substantial danger of undue prejudice, of confusing the issues or of confusing the jury."

### 1. The evidence was Cumulative and Unnecessary

Evidence is properly excluded if it is cumulative. (People v. Barker (1979) 94 Cal. App. 3d 321, 333-334; People v. Burgener (1986) 41 Cal. 3d 505. 525-526, disapproved on other grounds in People v. Reyes (1998) 19 Cal. 4TH 743.) In the present case, the admission of multiple predicate acts and field contacts went far beyond all acceptable bounds. (People v. Williams 2009 Cal. App. Lexus 78, filed January 23, 2007 ["Williams"], People v. Leon (2008) 161 Cal. App. 4TH 149 ["Leon"].)

Williams speak to this situation. In Williams, the police executed a search warrant at Dimitri Allen's home. Once inside the police found a gun and drug paraphernalia and ammunition in the bedroom and a second gun and methamphetamine in the garage. (Id. at pp. 3-4.) There were seven gang members, including William in the house. (Id. at p. 6.)

Williams was convicted of gun and drug charges with gang enhancements and participation in a criminal street gang. (Id. at p. 1.) On appeal, he complained in part that it was error to admit dozens of contacts that he and fellow gang members had with law enforcement. (Id. at p. 2.) In fact, the prosecution had admitted 8 crimes committed by other gang members and evidence and dozens of contacts that the gang members had with the police regardless of whether the contact led to an arrest or conviction. (Ibid.)

The court of appeal agreed. It concluded that the trial court erroneously admitted evidence of Williams' prior arrests, which failed to lead to convictions and agreed that such evidence is inadmissible because "such evidence invariably suggests the defendant has bad character." (Id. at p. 32 citing People v. Duran (2002) 97 Cal. App. 4TH 1448, 1458-1459; People v. Anderson (1978) 20 Cal. 3d 647, 650 and People v. Bryden (1998) 63 Cal. App. 4TH 159, 183.)

The Williams Court recognized that evidence of predicate offenses are necessary to prove a pattern of criminal activity or that the gang has "consistently and repeatedly" engaged in criminal activity (Williams, supra, at p. 30 citing People v. Sengpadychith (2001) 26 Cal. 4TH 316, 324), but held nonetheless, that such evidence must be scrutinized under the cumulative prong

12.

. of an evidence code section 352 analysis. (Williams, Supra, at p. 31.)

The Williams court acknowledged that evidence of other crimes is inflammatory and prejudicial and held that no party has the right to present cumulative evidence that creates a substantial danger of undue prejudice. (Id. at p. 34.) Thus the Williams court found that trial court abused its discretion when it permitted the admission of cumulative gang evidence and defendant's prior arrests, (Id. at pp. 36-37.) The court held that under a Watson standard, the error was harmless given the overwhelming evidence of Williams' guilt. (Id. at pp. 37-39.)

In Leon, Supra, 161 Cal. App. 4TH 149, the court reached a similar conclusion. Leon was convicted of burglary, attempting to dissuade a witness from reporting a crime, possessing a concealed firearm in a vehicle while being an active participant in a criminal street gang, and carrying a loaded firearm while being an active participant criminal street gang. During trial, the court permitted the prosecutor to introduce evidence of Leon's 1999 juvenile adjudication for robbery for the purpose of establishing the predicate offenses necessary to establish the section 182.66, subdivision (b)(1) gang enhancements. (Id. at p. 165.)

On appeal, the court found that this evidence was highly prejudicial and cumulative to other evidence that that proved that Leon was a gang member and held that the trial court abused its discretion when it failed to exclude the evidence pursuant to Evidence Code section 352. (Id. at p. 169.) Like Williams, it found the error harmless. (Id. at pp. 169-170.)

Like the situations in Leon and Williams, the numerous predicate offenses and field contacts was cumulative and unnecessary to prove the elements of the offenses. Unlike these cases, however, the evidence was prejudicial to Chawa.

## 2. Much of the Evidence was Irrelevant

Much of the evidence should have been excluded because it was irrelevant. Only relevant evidence is admissible. (Evid. Code sec. 350; People v. Kelly (1992) 1 Cal. 4TH 495, 523.) Relevant evidence is defined as "having any tendencies in reason to prove or disprove any disputed fact that is of consequence to the determination of the action". (Evid. Code Sec. 210.) A trial court lacks the discretion to admit irrelevant evidence. (People v. Benavides (2005) 35 Cal. 4TH 69, 90.) In the present case, the many of the circumstances under which the police contacted appellant and the others were unnecessary to prove the elements of this case.

For example, some of the incidents reveal the police contacted the defendants because they were suspects or participants in other offenses, or when they were booked into juvenile hall. (See e.g. field contacts numbers 2,3,4,5,7,8,10,14,16,17,19 ante; People v. Anderson (1978) 20 Cal. 3d 647,650 [Evidence of arrests and prior bad acts inadmissible to prove conduct or for impeachment].) Although the jury might been told about the defendants' admissions or the fact that they were wearing gang colors when contacted, the other bad acts were irrelevant and the admissible contacts should have been sanitized to exclude them.

## 3. The Evidence was unduly Prejudicial

As both the Williams and Leon Court's recognized, it has long been recognized that the admission of prior convictions or bad acts may create a risk of grave harm to a criminal defendant. (People v. Rollo (1977) 20 Cal. 3d 109,119; People v. Edwoldt (1994) 7 Cal. 4TH 380, 404; People v. Lewis (2001) 25 Cal. 4TH 610, 637; Old Chief v. United States (1997) 519 U.S. 172 [117 S.Ct. 644].) Holding that the prosecutor could not admit evidence to prove a prior conviction when the defendant offered to stipulate to the fact, the United State Supreme Court recognized that evidence of prior bad acts, although relevant, creates a risk that the jury will convict for crimes other than those charged, or that, uncertain of guilt, convict anyway because a bad person deserves punishment. This risk "creates a prejudicial effect that outweighs ordinary relevance." (Id. at p. 181, quoting

13.

United States v. Moccia (1ᵗʰ Cir. 1982) 681 F.2d 61, 63.) Likewise, in People v. Ewoldt, supra, 7 Cal. 4ᵀᴴ 380, the California Supreme Court noted that the admission of uncharged conduct has a substantial prejudicial effect and such evidence is admissible only if it has substantial probative value. (Id. at 403.) No such showing was made in the present case.

Respondent notes that the trial court makes a discretionary decision in ruling on evidentiary objections. (AG 37-38.) Respondent's argument has three or four parts.

It begins: (1) The prosecutor was required to show that the Oriental Troop (OT) was a criminal street gang and appellants were active participants, a point reiterated from his prior argument, presumably including his attempted justification for ten prior acts and twenty-five contacts. (AG 37-38.)

Appellant agrees that the prosecutor had a burden of proof to show OT as a criminal street gang in which appellants were active members. That, however, does not address the problems in this specific case raised by chawa See's issues.

The "reiteration" (AG 38) also tends to emphasize how cumulative and irrelevant the evidence was, and how lacking was any particular probative force for this inflammatory evidence of acts against his own mother.

This is also not to mention the tenuous to non-existing relationship of these acts in their context to the gang membership and participant. Respondent offers them as additional proof of gang membership and participation, but they lack probative strength to justify the additional prejudice. The point of this evidence was not to prove what was amply proven and not seriously contested, but rather it was to raise anger and concern and fear in juror to encourage a less rigorous requirement of proof and foster decision-making from protective concerns and a viewpoint that the defendant was undeserving and had violent propensities.

Respondent's second point is (2) "The evidence complained of was prior juvenile adjudications." (AG 38, citing People v. Williams (2009) 170 Cal.App.4ᵀᴴ 587, 610 (Williams), explaining People v. Ewoldt (1994) 7 Cal.4ᵀᴴ 380, 405 [a prior conviction lessens risk jury will punish for prior act], superseded by statute as stated in People v. Brit (2002) 104 Cal.App.4ᵀᴴ 500, 505.)

Williams, however, favors appellant. The Court in Williams found the admission of three acts was relevant to establish the requirements to find membership in a criminal street gang, noting that there was a limiting instruction in Williams. However, it also found that after that the prosecution introduced eight other acts and contacts. "As noted above, the prosecutor introduced evidence of at least eight crimes committed by GPC members, and in argument to the jury, the prosecutor referred to several other incidents. We are unaware of any authority in which the court directly addressed the volume of evidence that may be introduced to establish the primary activities and predicate crime elements of a gang enhancement or gang charge. However, any such evidence must be subject to to scrutiny under Evidence Code Section 352, and part of the analysis under that section is whether the evidence is cumulative. We will discuss below whether the admission of cumulative evidence resulted in prejudice." (Id., at p. 609.)

The Williams opinion found that the introduction of unconvicted charges was error in the case. Prejudicial, unnecessary, and cumulative the acts without conviction should have been excluded. It is at this point that respondent's use of the case appears to distinguish the next group, namely those where there had been convictions. Those, too, were found inadmissible due to their cumulative and prejudicial nature.

After "strongly disagree[ing]" with the Attorney General's approach that the prosecutor is entitled to put on excessive evidence, the court again referenced People v. Ewoldt, supra, to point out that cumulative evidence [even of convicted offenses] is subject to exclusion under Evidence Code Section 352.

In Ewoldt, the Supreme Court emphasized that cumulative evidence of uncharged offenses may be inadmissible under Evidence Section Code 352. The court explained, "In many cases the prejudicial

14.

effect of such evidence would outweigh its probative value, because the evidence would be merely cumulative regarding an issue that was not reasonable subject to dispute.' (Ewoldt, supra, 7 cal. 4TH at pp. 405-406)" (People v. williams, supra, 170 Cal. App. 4TH 587, 610-611.)

As for respondent's mention of juvenile adjudications, the williams opinion continued to support its view with the following:

"[I]n People v. Leon (2008) 161 Cal. App. 4TH 149, 168 and 169 [73 Cal. Rptr. 3d 786], the court held that the trial court abused its discretion in admitting evidence of defendant's prior juvenile robbery adjudication to establish both that the defendant was a gang member and that the group in question was a criminal gang. The court noted that the robbery convictions of other gang members were sufficient to establish the gang predicates offense, and the evidence of the defendant's gang membership was overwhelming. (Id. at p. 169.)" (People v. Williams, supra, 170 Cal. App. 4TH at p. 611.)

People v. Leon, supra, also discussed the application of Ewoldt as follows:

"The Supreme Court has repeatedly stressed that 'evidence of uncharged misconduct "' is so prejudicial that its admission requires extremely careful analysis.' " (People v. Lewis (2001) 25 Cal. 4TH 610, 637 [106 Cal. Rptr. 2d 629, 22 P.3d 392], quoting Ewoldt, supra, 7 Cal. 4TH at p. 404; e.g., People v. Medina (1995) 11 Cal. 4TH 694, 748 [47 Cal. Rptr. 2d 165, 906 P.2d 2].) Since 'substantial ~~evidence~~ prejudicial effect [is] inherent in [such] evidence', uncharged offenses are admissible only if they have substantial probative value. If there is any thought, the evidence should be excluded.' (People v. Thompson (1980) 27 Cal. 3d 303, 318 [165 Cal. Rptr. 289, 611 P.2d 883], fn. omitted, overruled on another ground in People v. Rowland (1992) 4 Cal. 4TH 238, 260 [14 Cal. Rptr. 2d 377, 841 P.2d 897]; see also People v. Haston (1968) 69 Cal. 2d 233, 244 [70 Cal. Rptr. 419, 444 P.2d 91] [ other crimes evidence ' " should be received with 'extreme caution', and if its connection with the crime charged is not clearly perceived, the doubt should be resolved in favor of the accused" ].) For example, in Ewoldt the Supreme Court emphasized that where uncharged offense evidence is cumulative, it will often be inadmissible pursuant to Evidence Code Section 352. (Ewoldt, supra, 7 Cal. 4TH at pp. 405-406 ['In many cases the prejudicial effect of such evidence [ offered to show a common design or plan] would outweigh its probative value, because the evidence would be merely cumulatively regarding an issue that was not reasonably subject to dispute.'].)" (People v. Leon, supra, 161 Cal. App. 4TH 149, at pp. 168-169.)

Appellant will add that a juvenile adjudiscation may be viewed by some as a mere slap on the wrist, a coddling of this defendant who is associated with seemingly endless acts of gang and other violent conduct. (See, e.g., Welf. and Inst. Code 203; cf. In re Contreras (1952) 109 Cal. App. 2d 787, 789 [ common knowledge adjudication is merely "a blight upon the character of and is a serious impediment to the future of such minor."].) The act underlying the adjudication, particularly coupled with the excessive other acts and contacts with the police, paints sinister picture of an incorrigible running wild who must be stopped regardless of any doubt as to guilt in this case.

Thus, respondent's reliance of the juvenile adjudications as a minimalising of risk of prejudice under williams and Ewoldt favors sloganeering and overlooks the actual reasoning and cautions of those cases. Although acts on which there was no conviction may have an additional ~~factor~~ factor that the juror could find guilt due to the prior act having gone unpunished, clearly Williams, Leon, and Ewoldt are not stating that the remaining prejudicial aspects are dissipated. They simply do not have this one additional factor, and as appellant's addendum above indicates even that absence is not complete where there is merely a juvenile adjudication.

Respondent's third point is also unavailing: (3) "None of the listed predicate offenses

15.

and field contacts was so inflammatory in comparison to the charged offenses that it threatened to sway the jury to convict regardless of actual guilt. (Cf. People v. Hernandez [(2004)], supra, 33 Cal. 4TH [1040,] at pp. 1050-1051.)

One must ask where the "because" clause went and note the absence of the description of how on the entire case this would matter, or observe the volume is the key. The "cf" cited does not ~~supply~~ supply the answer. Hernandez was discussing the issue of whether gang evidence should have been bifurcated. The opinion recognized that there were times when bifurcation may be necessary:

"The predicate offenses offered to establish a 'pattern of criminal gang activity' (186.22, subd. (e)) need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation. Moreover, some of the other gang evidence, even as it relates to the defendant, may be so ~~extraordinarily~~ extraordinarily prejudicial, and **of** so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (People v. Hernandez, supra, 33 Cal. 4TH at p. 1048.)

Hernandez is otherwise unhelpful. At the location cited (pages 1050-1051) the Supreme Court notes that the burden of bifurcation is on the moving party. Admissibility usually must also be established by the proponent of the evidence. (See People v. Morrison (2004) 34 Cal. 4TH 698, 724.) The evidence in question was that some members had driven a car without the owner's consent. At this point, among other factors, the Court did say of its case: "Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendant's actual guilt." People v. Hernandez, supra, 33 cal. 4TH 1040-1050.) The evidence in the present case was possession of a gun on a different occasion by Chawa as a juvenile and threatening his mother when frustrated as a juvenile. Issues in this case included who fired the shot and who engaged in the most violent of acts. Even in an abstract view based on the difference between murder and terrorist threats/gun possession, this case is not one where the defendant was just caught riding in someone else's car. Both in nature and on the issues in the case, Hernandez is not an analogous case to support a bare conclusion that in this case there was no danger ~~at~~ at all of a juror not being swayed by the excessive evidence of violence and terror and by the prior possession of a firearm.

In what may be meant as a fourth point: (4) Respondent quotes a portion of defense counsel's examination of the experts. (AG 39-40.) Understandably, defense counsel tried to emphasize that Chawa did not actually shoot anyone; however, the defense examination trying to make the best of a bad situation is not the same as the introduction of the evidence in the first place including for examples:

Q. And was the juvenile petition sustained against Chawa See for ~~that~~ vehicular burglary on March 10TH 2005, to your knowledge?

A. It was

Q. All right. What about a crime on April 6TH, 2005, an arrest out of a vehicle?

A. Yes

Q. Are you familiar of that case?

A. I am

Q. Okay. If you could tell me about that.

A. Yes. That was — in brief — a disagreement with his girlfriend's family. He had threatened to shoot the victims and identified himself as a person who associates with — associates with gangs. He was booked and the juvenile petition was sustained on that.

16.

Q. Alright. And was this at his- it was his ex-girlfriend's house?

A. Ex-girlfriend, yeah.

Q. Did he arrive there and walk into that residence.

A. He did.

Q. And that's when they were asking him to leave, him threatened to shot them?
[Objection to prosecutor testifying sustained.]

Q. And you indicated, I believe, to your knowledge that the petition was sustained for that for the April 6TH, 2005, crime?

A. Yes.

Q. Would that be of the criminal threats?

A. Yes. 422 of the penal code.
[Exhibit 28, sustained petition admitted.]

Q. Are you familiar with an incident that occured on Dec. 20TH, 2005, at his residence, Chawa See's residence, a probation search?

A. Yes. That was a probation search that was conducted by Probation Officer Lancaster. The search revealed a .38 caliber handgun and live ammunition in the room that belonged to Chawa See.
[Establishing Lavang See was there but Chawa See was not.]

Q. To your knowledge, was a petition sustained against Chawa See for being a minor in possession of a hand gun?

A. It was.

Q. That crime that occured on Dec, 2005, when the gun was found in his room?.

A. Yes.

Q. Where was he living at the time? What city?

A. At the time I believe it was in the City of Visalia. Yeah.

Q. His mother was living there as well?

A. Yes.

Q. Back in '05?

A. Yes.
[People's Exhibit 27 entered into evidence.]
(3RT 608-611.)

However, the above is only a tidbit of what was said and done. For further example, it was preceded by the numerous gang crimes, including murder and so forth, by various members. Then attention turned to Chawa See and various gang indicia. And, immediately after the quoted material and the opinion that Chawa See belonged to the gang and all the criteria he met, the prosecution elicited further testimony regarding the gun (not the one used in the present case) found in the room with Lavang on December 20, 2005, and the April 6, 2005, incident at the girlfriend's residence (3RT 615-616), and a new one where he was involved as a victim in a gang drive-by shooting because he was associating with gang members (3RT 616-617), Various bookings at juvenile hall were discussed. This again served to remind the jurors that on Dec. 20, 2005, he was booked for "the gang crime of possession of a hand gun" (3RT 619). This list can be extended, but the point is that respondent's quoted material is simply material torn from the fabric, a tiny bit of no import on the overall record.

Even sufficiency of the evidence review requires examination of the entire record rather than a modicum or snippet offered up as support (Jackson v. Virginia (1979) 443 U.S. 307, 317, 320; People v. Johnson (1980) 26 Cal. 3d. 557, 577-578), and

• sufficiency analysis assumes and errorless record. where there is error, and the question is prejudice, such rules do not apply, and particularily respondent's application of a portion
• put on by defense counsel cross-examining a prosecution expert witness with every possible interest to de-emphasize the evidence while not ignoring it entirely.

"We have stated at the outset of this opinion that we find substantial error in this record. That being said, it is no longer our obligation to consider the evidence, with all its inferences, in the light most favorable to respondent (i.e., the "substantial evidence" rule). On the contrary, where substantial error is found it becomes an appellate court's duty to review the entire record, weighing to some extent conflicting evidence, to determine whether there has been a miscarriage of justice requiring reversal." (People v. Henry (1972) 22 Cal. App. 3d 951, 956, fn. 3.) "It must be obvious that when we have found error and test the question of reversibility under the principles just stated we no longer apply the 'substantial evidence rule' as a basis to uphold the verdict. A reweighing of all the evidence is our inevitable obligation. Fullfilling that obligation, we have considered evidence which might be said to favor the defense." (People v. Wheelwright (1968) 262 Cal. App. 2d 63, 71.)

Respondent's Attorney General's analysis in this case is fatally flawed by his failure to recognize that an error means the analysis of prejudice cannot assume that the jurors properly found guilty. That is the question, not the answer. (Cf. Standen v. Whitley (9th Cir. 1993) 994 F.2d 1417, 1423, and Nelson, J. concurring at 1426.)

Chawa See might not have been entitled to a perfect trial, but he was entitled to a fair one in which his defense was considered rather than buried by cumulative, unnecessary, inflammatory, propensity-type evidence which is recognized as being highly prejudicial. No instruction reduced the likelihood of misuse. in this jointly tried case, where the prosecutor and co-defendant sought to place responsibility on Chawa, but nonetheless there was evidence that Billy Her or Lavang See was responsible, and where the individual charges also could differ and needed careful consideration, there is no reason not to think that this evidence had its recognized general effect and had an impact on the outcome. (People v. Watson (1956) 46 Cal. 2d 818, 837 [showing required is less than an equal balance of probabilities]; College Hospital, Inc. v. Superior Court (1994) 8 Cal. 4th 704, 715 ["reasonable chance" all that is required]; Ghilotti v. Superior Court (2002) 27 Cal. 4th 888, 918 [reasonable "possibility" the error "contributed" to the outcome].)

It is respectfully submitted the judgement should be reversed.

D. Appellant recieved Ineffective Assistance of Counsel when his trial attorney failed to object to the admission of this evidence

If this Court holds that appellant had an obligation to object in order to preserve the issue for appeal, appellant asserts that he recieved ineffective assistance of counsel when his trial counsel failed to object dispite his terrorist threat and a minor in possession on a gun. "The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy of our adversary process. The essence of an ineffective-assistance claim is that counsel's uprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered suspect." (Kimmelman v. Morrison (1986) 477 U.S. 365, 374 [91 L. Ed. 2d 305, 318-319, 106 S.Ct. 2574].) To prevail on a claim of ineffective assistance of counsel, appellant must show that counsel's representation fell below an objective standard of reasonableness, and but for counsel's inaction, there is a reasonable probability the result of the proceeding would have been been

18.

different. (Strickland v. Washington (1984) 466 U.S. 668, 688, 694 [80 L. Ed. 2d 674, 693, 698, 104 S.Ct. 2052; Lockhart v. Fretwell (1993) 506 U.S. 364, 113 S.Ct. 838, 845.) This is essentially the same test that was adopted by our Supreme Court.

In the present case, counsel failed to object to the omission of this evidence. There could not be any tactical reason to support trial counsel's omission; the exclusion of the uncharged conduct could only benefit appellant. For the reason set forth in Section C.; appellant asserts that absent the admission of the prejudicial evidence the trial result was likely to be different. Accordingly, appellant's judgement of conviction must be reversed.

## Conclusion

For the foregoing reasons, appellant Chawa See respectfully requests that the judgement be reversed.

Date: November 8, 2010

Respectfully submitted

Chawa See

19.

PROOF OF SERVICE BY UNITED STATES MAIL
(Code of Civil Procedure, Section 1015)
(28 U.S.C. Section 1746)

Case NO: 1:10-cv-01520-AWI-JLT

I, __Chawa See__, declare, depose and say, the following statement is true and correct under penalty of perjury according to the laws of the State of California based on matters known to me personally to be true:

1) I am over the age of eighteen years, a resident and prisoner of the State of California with a present mailing address of: High Desert State Prison, P.O. Box 3030, Susanville, CA 96127-3030.

2) On this __8__, day of __November__, 20__10__, I caused a true and correct copy of the following, specifically described document(s) to wit:

"Points and Authorities in Support of Traverse"

at the prison to be placed in a sealed envelope(s), with First Class postage having been placed thereon, fully addressed to the interested person(s) described hereinafter, back of the envelope(s) signed and dated by a Correctional Officer and then deposited such envelope(s) in the prisons internal legal mail system for processing and delivery to the United States Postal Service, for delivery to the addressee(s):

Office of the CLERK
United States District Court
Eastern District of Cali.
2500 Tulare Street,
Suite 1501
Fresno, Ca 93721

3) I declare that there has been regular U.S. mail pick-up by the Correctional Officers at the prison where I posted the envelope(s) that are described above, and regular communication by mail between the place of mailing and the place(s) so addressed.

Executed this __8__, day of __November__, 20__10__ under penalty of perjury according to the laws of the State of California, in Lassen County, City of Susanville.

Declarant