UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHAWA SEE, | ) Case No.: 1:10-cv-01520-AWI-JLT |
| Petitioner, | ) FINDINGS AND RECOMMENDATIONS TO |
| | ) DENY PETITION FOR WRIT OF HABEAS |
| v. | ) CORPUS (Doc. 1) |
| | ) |
| McDONALD, | ) ORDER DIRECTING THAT OBJECTIONS BE |
| Respondent. | ) FILED WITHIN TWENTY DAYS |
| | ) |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is in custody of the California Department of Corrections and Rehabilitation ("CDCR") serving an indeterminate sentence of life without the possibility of parole pursuant to a judgment of the Superior Court of California, County of Tulare (the "Superior Court"). On April 17, 2008, Petitioner was convicted by jury trial of first degree murder and conspiracy to commit murder. (Cal. Pen. Code §§ 182, 187). (Doc. 15, Lodged Documents ("LD") 1, p. 1; Doc. 1, p. 1). The jury found that the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang (Cal. Pen. Code § 186.22(b)), that the murder was committed while Petitioner was an active participant in a criminal street gang (Cal. Pen. Code § 190.2(a)(22)), that Petitioner personally and intentionally discharged a firearm proximately causing the death of the victim (Cal.

1

1   Pen. Code § 12022.53(d) & (e)(1)), and that Petitioner personally discharged a firearm.  (Cal. Pen.

2   Code § 12022.53(c) & (e)(1)).  (LD 1, pp. 1-2).  Petitioner was sentenced to an indeterminate term of

3   life without the possibility of parole plus a consecutive 25 years to life sentence for the firearm

4   enhancement.  (LD 1, p. 2).

5        Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth Appellate

6   District (the "5th DCA") which, on December 19, 2009, affirmed the judgment of conviction and

7   sentence.  (LD 1).  Subsequently, the California Supreme Court denied Petitioner's petition for review.

8   (LD 2).

9        On August 23, 2010, Petitioner filed the instant petition, raising three grounds for relief.  (Doc.

10  1).  Respondent's answer was filed on October 29, 2010.   (Doc. 14).  On November 17, 2010,

11  Petitioner filed his Traverse.  (Doc. 16).  Respondent concedes that the all grounds for relief in the

12  petition have been fully exhausted.  (Doc. 14, p. 6).

13                              **FACTUAL BACKGROUND**

14       The Court adopts the Statement of Facts in the 5th DCA's unpublished decision:

15       Around 6:30 p.m. on October 1, 2006, 16-year-old Robert Trevino was throwing a football
         with other neighborhood children on a residential street. Five Asian males approached him;
16       one had a handgun in his waistband. Four of the males wore blue and black bandannas,
         covering their faces from the nose down. The one male whose face was uncovered shook hands
17       with Trevino. He then pointed behind Trevino and Trevino turned around. The individual with
         the handgun shot Trevino in the head, from a distance of three or four feet. The five Asian
18       males then fled.

19

20       Police officers arrived at the scene and found Trevino lying on the side of the road, bleeding
         from a head wound. A police officer checked his pulse, but found none. A .380-caliber shell
21       casing was found in the middle of the road.

22       Witnesses identified four of the five Asian males as Chawa, Lavang, Aitang, and Billy Her.
         Her was identified as the individual who shook hands with Trevino. Chawa was identified as
23       the person who shot Trevino.

24       On October 6, 2006, the police obtained and executed a search warrant for appellants'
25       residences. Police arrested Aitang at his apartment and found writings and clothing relating to
         the Oriental Troops (OT) gang in his bedroom.
26

27       Police were unable to locate Chawa, but located a .380-caliber semiautomatic handgun beneath
         the mattress in Chawa's bedroom. Three live rounds were retrieved from the magazine.
28

Subsequent test bullets from the handgun were found to match the bullet retrieved from Trevino's head.

Lavang was arrested on October 17, 2006, and Chawa the following day. Lavang admitted to the officers that he was one of the individuals who approached Trevino right before the shooting, but denied that he shot him or that the group planned to shoot him.

At trial, Lavang's former girlfriend, Tawny Chamberlain, testified that she hung out with members of the OT gang, and that, at the time of the shooting, she was pregnant with Lavang's child. Chamberlain spoke to Chawa sometime after the shooting. When she asked him why he shot Trevino, Chawa said that he "deserved it" and was "dissing the hood."

Her, who was offered a plea of voluntary manslaughter with a criminal street gang enhancement, testified as a prosecution witness. He testified that he, Chawa, Lavang, Aitang, and Chawa's younger brother approached Trevino. Her shook hands with Trevino and asked him about his brother. He denied pointing his finger to distract Trevino and he denied having any knowledge that Chawa, whom he identified as the shooter, planned to shoot Trevino.

According to Her, he overheard a conversation between Chawa and an OT gang member, Jack Noi, a few weeks prior to the shooting. Noi told Chawa that he was having a problem with Trevino in juvenile hall. Chawa told Noi "don't worry about it," and said he would take care of it.

Officer Luma Fahoum testified as an expert on the OT gang in Tulare County. According to Fahoum, the OT is a predominately Asian male gang, and the location where Trevino was shot is an area OT claims as its "turf." The Nortenos, a Hispanic gang, is a rival gang to the OT in Tulare County. The Nortenos identify with the color red, number 14, and the letter N. The OT identify with the color blue, numbers 15 and 20, and the letters O and T. But due to criminal street gang prosecutions, OT members often wore neutral colors, such as white, black and gray. As of October 1, 2006, there were about 50 documented OT members.

Officer Fahoum described the OT as the "most vicious and deadly gang in Visalia" for its size. The primary activities of the OT include murder, carjacking, witness intimidation, assault with a firearm, drive-by-shootings, robbery, and burglary. Officer Fahoum described multiple "predicate offenses" committed by various OT members.

Based on self-admissions, associations, tattoos, and clothing, Officer Fahoum opined that Chawa, Lavang, Aitang, Chawa's brother, and Her were active members of the OT. Fahoum described the Mongolian Boys Society (MBS) and the Lahu Pride Crips (LPC) as "entry-level" OT gang members. According to Fahoum, Trevino was a validated Norteno.

In response to the following hypothetical-if a group of OT members, most of whom had blue or black bandannas covering their faces, approach a rival gang member and shoot him in the head-Officer Fahoum opined that the shooting was committed in association with and for the benefit of the OT.

Defense

3

Chawa's younger brother testified and suggested Her was the shooter. Although Chawa's brother acknowledged that he lived with Chawa and his family in the house where the handgun was found, he claimed Her had asked him prior to the search to take and store the handgun. Chawa's brother said he took the gun and put it under the bed because he and Her were both in the same gang, the MBS.

(LD 1, pp. 1-3).

## DISCUSSION

### I.     Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### II.     Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)  resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d);  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529 U.S. at 412-413.

4

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. 326, 405-406 (2000). A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Id., quoting Williams, 529 U.S. at 409-410; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)(per curiam).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409).  In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  If fair-minded jurists could so disagree, habeas relief is precluded.  Richter, 131 S.Ct. at 786. As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction.  Richter, 131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332, 99 S.Ct. 2781, n. 5 (1979)(Stevens, J., concurring in judgment).  The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fair-minded disagreement." Richter, 131 S.Ct. at 787-788.

Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1398 ("This backward-looking

5

language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at the same time–i.e., the record before the state court.")

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings.  Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520;  Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

The AEDPA also requires that considerable deference be given to a state court's factual findings.  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."  Miller-El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d),  the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

"[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002);  Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

### III.  Review of Petitioner's Claims.

The instant petition itself alleges the following as grounds for relief: (1) the trial court abused its discretion and denied Petitioner's due process rights when it excused juror no. 9 prior to jury deliberations; (2) excessive gang evidence denied Petitioner his right to a fair trial; and (3) Petitioner's sentence violated the Eighth Amendment's prohibition against cruel and unusual punishment.  (Doc. 1).

A.  Dismissal Of Juror No. 9 Violated Petitioner's Right To Due Process Of Law.

Petitioner first contends that the state court's dismissal of juror no. 9 before deliberations denied him his right to due process. This contention is without merit.

1.  The 5th DCA's Opinion.

The 5th DCA addressed this claim as follows:

Appellants contend that the trial court committed prejudicial error in removing juror No. 9 over objection. Respondent disagrees and argues the trial court properly exercised its discretion. We

find no prejudicial error.

### a.  The Record

On the fifth day of trial, during a break in the court's instructions to the jury, juror No. 9 asked to speak to the court. The juror explained that she realized, only after Chawa's brother testified, that their sister was a student of hers:

"[JUROR 9]: ... I hesitated a lot of coming or not. I know the family of Chawa See. His sister is my student, but-

"THE COURT: You didn't know that before.

"[JUROR 9]: I didn't know that before it was coming up. I didn't even know they were from Lindsay. I didn't know until today.

"THE COURT: Okay.

"[JUROR 9]: I recognize the face of Nalae See, the sister of Chawa. And then I also have to add if you're gonna ask me, 'Is that gonna change the way you deliberate,' I don't think so, but it affects my feelings and my hearts.

"THE COURT: What do you mean, it affects your feelings and your hearts?

"[JUROR 9]: Well, no, no, no. Actually, I've been thinking about Nalae, but it won't change the way-my opinions. I already made up my mind.

"THE COURT: Well, you really can't make up your mind before you deliberate with the other jurors, so I hope you didn't make up your mind yet.

"[JUROR 9]: See? I'm confusing things. I understand.

"THE COURT: I understand.

"[JUROR 9]: Do I go back and say everything again...."

The court then stated what it needed was some clarity on the juror's "actual relationship" with the family. Juror No. 9 explained that she was a high school teacher and Nalae was currently a student of hers and had been since last year. Juror No. 9 had never met Nalae's parents or anyone else in the family. She did not know any of the other witnesses. The court then asked if Juror No. 9 could "set that aside" or whether she would feel "pressure one way or another" because she was her student. The following colloquy then occurred:

> "[JUROR 9]: No. I was just trying to give you an opinion, since I was chosen as the last juror to put on the panel, if you could go ahead and pick one of the two remaining ones.

"THE COURT: You're saying you'd have trouble deciding the case, is what you're saying.

"[JUROR 9]: No. Well, it makes me feel bad."

The prosecutor then stated he thought "we could stipulate," but Chawa and Aitang's counsel disagreed. The court again asked juror No. 9 if this information was going to affect her ability to judge the case, noting that she vacillated between saying it would not affect her, telling the court that she was ready for an alternate to take her place, and that this information "affects your heart." Juror No. 9 again stated, "[I]n the human part I'm thinking about Nalae." When asked if the "human part" kept her from being fair, she said, "No, I will be fair."

Aitang's counsel questioned the juror, asking whether, despite the discovery of this information, she could still be fair and impartial. The juror responded that she could, but also mentioned again the idea of being replaced with an alternate juror. When told that decision was not hers but up to the court, juror No. 9 said she "brought the situation to you so that you decide."

The prosecutor questioned juror No. 9 and asked how she would feel about going back to the classroom to teach Chawa's sister if she were to find Chawa guilty. Juror No. 9 claimed it would not make her hesitant to actually find him guilty, "[b]ut if I say he's guilty, I'm pretty sure tomorrow when I go back to school ... I will be looking at Nalae and maybe feeling bad." When asked again, she again said she would not be hesitant to actually find him guilty, but she would "feel bad" for his sister.

Juror No. 9 also expressed some concern that the students at her school were able to infer, due to her absence from school, that she was on the jury involving Chawa's family. But she again denied that this concern would keep her from finding Chawa guilty.

The trial court then asked the juror to return to the jury room. Following a lunch recess, the prosecutor asked that the court remove the juror, noting that she not only knew someone she could sympathize with, but that the deadliness of the OT gang added a "fear aspect." The prosecutor summarized, "The point is that it's highly prejudicial to the People's case keeping her on, whereas if we remove her there's no prejudice to anybody's side...."

Aitang's counsel, Chawa's counsel, and Lavang's counsel each objected, arguing, in essence, that juror No. 9 expressed an eagerness to render a fair and impartial verdict. But the prosecutor noted that, had Juror No. 9's relationship with Chawa's sister been known at the beginning of trial, she would have been excused immediately.

The trial court, noting that juror No. 9 "fumbled on her words a little bit" because English was not her first language, nonetheless decided to keep the juror, stating it was "not convinced that she can't be fair." But later, following the parties' closing arguments, the court again addressed the issue. Addressing juror No. 9 in chambers, the court stated that, after reconsidering, it had determined it would excuse her because keeping her on the jury would be "asking too much of the juror to set [the relationship] aside and ignore it all and try to be objective." For the record, the court then stated its reasons for excusing the juror:

"As I thought about it, I realized that clearly she would have been excused had she brought up that fact at the beginning of the trial. I want to specifically say the prosecutor did not sway my mind whatsoever. I'm thinking for the integrity of the system we probably need to excuse a juror like that that can be observed by an impartial observer to somehow have some information about this case. If she voted guilty, she'd have to go back and face the actual sister of the person that she found guilty. If she found them not guilty and a personal observer can say, well, she knows ... [¶] ... [¶] ... she was biased. I think just for the integrity of the system, even though she said she could be fair and impartial, I think it would be an undue burden to place upon anybody in this system. We attempt to get jurors that have nothing to do with either side, and that's what we would have done in the first place had we known she would have been involved in some way, we would have clearly-I would have excused her right off the bat."

Although Chawa's counsel stated, "I think that that's a sound reason. I have no objection," Aitang's counsel reiterated his earlier objection.

A criminal defendant has a fundamental constitutional right to a fair trial by an impartial jury. (See People v. Cleveland (2001) 25 Cal.4th 466, 487-488 (conc. opn. of Werdegar, J.).) However, that constitutional right does not entitle a defendant to a jury composed of any particular individuals. (People v. Hamilton (1963) 60 Cal.2d 105, 128, disapproved on other grounds in People v. Morse (1964) 60 Cal.2d 631, 637, fn. 2.)

Section 1089, provides in relevant part: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, ... the court may order the juror to be discharged." A trial court's decision to remove a juror is reviewed under an abuse of discretion standard and will be upheld only if that juror's disqualification appears on the record as a demonstrable reality. (People v. Wilson (2008) 43 Cal.4th 1, 26.)

"[¶] The demonstrable reality test entails a more comprehensive and less deferential review [than the substantial evidence test]. [The demonstrable reality test] requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (People v. Barnwell (2007) 41 Cal.4th 1038, 1052-1053, original italics.)

The court's exercise of discretion to exclude a juror, who would be called on to judge the credibility of a witness and the defendant, both brothers of a current student, is analogous to the "cause" challenge utilized in ordinary jury voir dire. Potential jurors are questioned during voir dire whether they are familiar with the defendants and/or potential witnesses, so that the court can determine whether any of the jurors have an actual, or potential, bias concerning the case. (See Code Civ. Proc., § 225, subd. (b)(1); People v. Jimenez (1992) 11 Cal.App.4th 1611, 1622, disapproved on another ground in People v. Kobrin (1995) 11 Cal.4th 416, 419.) As

10

juror No. 9 told the trial court, she was not aware until after Chawa's brother testified for the defense that their sister Nalae was a current student of hers. Had this fact been known prior to the start of trial, there is no question that she would have been excluded during voir dire. An admission by a juror that an extraneous matter might enter into his or her thought processes is adequate ground for the exclusion of a juror for cause. (See, e.g., People v. Hecker (1990) 219 Cal.App.3d 1238, 1242-1243 [juror informed the court she had seen defendant attending her church].)

In People v. Abbott (1956) 47 Cal.2d 362, the court upheld the trial court's discharge of a juror who worked in the same office as the defendant's brother, using a desk only 25 feet away, despite the juror's statement that he did not know the brother and his belief that he could render an impartial verdict and did not wish to be relieved. (Id. at pp. 370-371.) The trial court stated that the reason for discharge of the juror was "because of [the juror's] proximity to [defendant's] brother in the office where they worked and in order to save [the juror] from embarrassment or criticism," as there were people in the office who knew both men. (Id. at p. 371.)

Here, we find no error. However, if error occurred, we would find no prejudice.

> "It is long-established law in California that where an alternate juror, approved by defendant in voir dire, is allowed to deliberate on the jury panel, the defendant bears a heavy burden to demonstrate that he was somehow harmed thereby." (People v. Hall (1979) 95 Cal.App.3d 299, 307; see also People v. Hamilton, supra, 60 Cal.2d at p. 127.)

Appellants have failed to satisfy even a minimal burden. This is not a case in which the record indicates a deadlocked jury was suddenly able to reach a verdict after substitution of an alternate. (See People v. Delamora (1996) 48 Cal.App.4th 1850, 1856.) It is not a case in which a juror who was favorable to acquittal was excused before or during deliberations. (See People v. Cleveland, supra, 25 Cal.4th at pp. 485-486; People v. Hamilton, supra, 60 Cal.2d at p. 127.) Instead, this is a case like People v. Abbott (1956) 47 Cal.2d 363, discussed in Hamilton, in which there is "no showing that the juror would have been more favorable to one side or the other." (People v. Hamilton, supra, at p. 127.) No prejudice occurred.

(LD 1, pp.18-23).

> 2.   Analysis.

Preliminarily, the Court agrees with Respondent that no clearly established federal law exists holding that the federal constitution provides that a juror who knows one or more persons connected to the pending trial has any protected interest in being treated like other jurors who do not know persons connected to such a trial.  Thus, no clearly established federal law provides that such a juror has a right to serve in that trial or that the criminal defendant has a right to retain such a person on the jury.  This

1    would be especially true where, as here, the juror failed to disclose her connections to persons in the

2    case during voir dire, thus raising a concern as to her impartiality and honesty, both requisites to a

3    juror's capacity to serve.  Petitioner does not cite, and the Court is unaware of, any clearly established

4    United States Supreme Court authority that establishes a federal constitutional right for Petitioner

5    under the circumstances described above.   If, as here, no Supreme Court precedent creates clearly

6    established federal law relating to the legal issues the habeas petitioner raises in state court, the state

7    court's decision cannot be contrary to or an unreasonable application of clearly established federal

8    law.  Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004).

9          Next, to the extent that Petitioner is contending that the trial judge abused his discretion under

10   state law to dismiss the juror, such a contention is not cognizable in federal habeas proceedings.

11   Generally, issues of state law are not cognizable on federal habeas.  Estelle v. McGuire, 502 U.S. 62,

12   67, 112 S.Ct. 475 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie

13   for errors of state law.' "), quoting Lewis v. Jeffers, 497 U.S. 764, 780, 110 S.Ct. 3092 (1990);

14   Gilmore v. Taylor, 508 U.S. 333, 348-49, 113 S.Ct. 2112 (1993) (O'Connor, J., concurring) ("mere

15   error of state law, one that does not rise to the level of a constitutional violation, may not be corrected

16   on federal habeas").  Indeed, federal courts are bound by state court rulings on questions of state law.

17   Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.)(1989). Further, "the availability of a claim

18   under state law does not of itself establish that a claim was available under the United States

19   Constitution." Sawyer v. Smith, 497 U.S. 227, 239, 110 S.Ct. 2822 (1990), quoting, Dugger v. Adams,

20   489 U.S. 401, 409, 109 S.Ct. 1211 (1989). Thus, to the extent that Petitioner's claim is premised upon

21   the state court's misapplication of California law, it is not cognizable in these proceedings.

22          In any event, Petitioner's claim is without merit.  "In all criminal prosecutions," state and

23   federal, "the accused shall enjoy the right to . . . trial  . . . by an impartial jury,"  U.S. Const., Amends.

24   6 and 14; see Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444 (1968); Irvin v. Dowd, 366 U.S. 717,

25   722, 81 S.Ct. 1639 (1961).  A trial court's decision to substitute a juror without good cause can

26   establish a Sixth Amendment violation. Perez v. Marshall, 119 F.3d 1422, 1426 (9th Cir.1997).

27          Under California law, a trial court may order a juror discharged if the juror dies or becomes ill,

28   or if good cause for the removal is shown. Cal.Penal Code § 1089. The trial court's authority to

remove a juror does not end once the jury begins its deliberations; rather, the trial court can remove a juror "at any time." Id. Once it has removed a juror, the trial court may then substitute an alternate juror for the removed juror. Id.

The Ninth Circuit has consistently held that "the California substitution procedure ... preserve[s] the 'essential feature' of the jury required by the Sixth and Fourteenth Amendments." Miller v. Stagner, 757 F.2d 988, 995 (9th Cir.1985) (holding trial court did not violate petitioner's right to jury trial by removing two jurors and replacing them with two alternate jurors despite that original jurors were removed on fifth day of jury deliberations), amended by 768 F.2d 1090 (9th Cir.1985); see Perez, 119 F.3d at 1427; see also Parker v. Pliler, 307 Fed. Appx. 81, 82 (9th Cir. Jan.8, 2009) (holding California Penal Code § 1089's "good cause" provision "does not facially violate the Sixth and Fourteenth Amendment right to an impartial jury" (citation omitted)); Diaz v. Alameida, 223 Fed. Appx. 586, 588 (9th Cir. Feb.27, 2007)(unpublished per curium opinion)("There is ample evidence to support the trial judge's determination that Juror No. 5 was emotionally unable to continue with deliberations….[The petitioner] has not presented clear and convincing evidence to overcome the presumption of correctness that we must accord the trial court's factual determination of juror fitness.").

When a petitioner challenges a California trial court's removal of a juror, the reviewing court need only decide whether the application of California's procedure violated the petitioner's Sixth Amendment rights. Perez, 119 F.3d at 1426. To make this decision, the reviewing court must determine whether good cause existed to support the juror's removal.  Id. In making this determination, the reviewing court must be mindful that a trial court's findings regarding juror fitness are entitled to special deference on habeas review. Id. (citing Patton v. Yount, 467 U.S. 1025, 1036–38 & n. 12, 104 S.Ct. 2885 (1984)).  A trial judge's exercise of his or her responsibility to be "ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen," Smith, 455 U.S. at 217 n. 7, inherently involves the trial court's "appraisal of witness credibility and demeanor."  Thompson v. Keohane, 516 U.S. 99, 111, 116 S.Ct. 457 (1995).  In performing that function, the trial judge is best positioned to make decisions regarding credibility and demeanor; hence, the "judgment of the jurist-observer" has been given "presumptive weight" in these

13

matters.  Id.  Thus, juror impartiality is a factual issue that is within the statutory presumption of correctness.  Id.; Wainwright v. Witt, 469 U.S. 412, 429 (1985); Tinsley, 895 F.2d at 525 ("findings of state trial and appellate courts on juror impartiality deserve 'a high measure of deference.'"); see Skilling v. United States, __U.S.__, 130 S.Ct. 2896, 2918 (2010)("reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality….").

Numerous federal appellate courts have "upheld the dismissal and replacement of jurors whose physical or mental condition prevented them from effectively participating in deliberations." Id. at 1427 (collecting cases). The Ninth Circuit has repeatedly denied habeas relief based on the removal of a juror where the juror's illness or emotional instability rendered the juror unable to perform the duties expected of a juror. See id. (holding dismissal of holdout juror permissible because juror's emotional instability, which made her unable to continue deliberating, provided good cause for her dismissal); Miller, 757 F.2d at 995 (rejecting challenge to trial court's dismissal of juror where trial court dismissed juror after juror called in sick on morning of fifth day of deliberations); see also United States v. Wilson, 894 F.2d 1245, 1250 (11th Cir.1990) (holding district court did not err in dismissing juror during deliberations due to juror's poor health).

Here, the Court is satisfied that the reasons stated by the state court for dismissing juror no. 9 were more than adequate to establish good cause and to satisfy any constitutional concerns.  The trial judge spoke on two separate occasions with juror no. 9 before initially declining to dismiss her, and then, after further consideration, deciding that dismissal was required.  As reasons for the dismissal, the state trial judge indicated that he believed the "integrity of the system" required excusing juror no. 9, that if she voted guilty, she would have to face Petitioner's sister, one of her students, when she returned to work, and that if she found Petitioner not guilty, she would almost certainly raise concerns that her relationship with Petitioner's sister had influenced her verdict.  The court then went on to note that if juror no. 9 had disclosed this relationship during voir dire, he would have "excused her right off the bat."  Finally, as the prosecutor noted in requested the juror's dismissal, there would be potential prejudice to the prosecution if juror no. 9 remained to deliberate, but there would be no prejudice to either side if she were excused and replaced by an alternate juror.  Under these circumstances, and giving the trial court its due deference on the factual determination as to juror no. 9's fitness to

14

1   deliberate, the state court's reasons for dismissing juror no. 9 were more than sufficient to satisfy the

2   "good cause" requirement.  Perez, 119 F.3d at 1426.

3          In his Traverse, Petitioner contends that the trial judge removed juror no. 9 because of societal

4   concerns, which are not mentioned in § 1089.  (Doc. 16, p. 11).  Petitioner misconstrues the trial

5   court's reasoning.  A fair reading of the transcript indicates that it was not societal concerns and

6   pressure that the trial court focused upon; rather, it was the likelihood that, despite her reassurances

7   that she could be fair and impartial, it was the prospect that, regardless of which way she voted, juror

8   no. 9 would place herself in an untenable position, that constituted a circumstance, in and of itself, that

9   would likely have had an influence on how she voted.  Moreover, as the 5th DCA's opinion points out,

10  the juror herself was ambivalent about whether she wanted to be placed in such a precarious position,

11  given her relationship with Petitioner's sister.  Under such circumstances, the state court's

12  adjudication was not objectively unreasonable.

13         Last, the Court agrees with the 5th DCA that any error would be harmless.  In Brecht v.

14  Abrahamson, 507 U.S. 619, 113 S.Ct. 1710 (1993), the U.S. Supreme Court substantially restricted

15  state prisoners' access to federal habeas relief by requiring a showing that the violation of a federally

16  guaranteed right had a "substantial and injurious effect or influence in determining the jury's verdict."

17  Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S.Ct. 1710, 1714 (1993) (quoting Kotteakos v. United

18  States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)).  In order for an error to have a "substantial and

19  injurious effect or influence," it must have "affected the verdict."  O'Neal v. McAnnich, 513 U.S. 432,

20  115 S.Ct. 992, (1995).   Thus, if the evidence is not merely sufficient, but so powerful, overwhelming,

21  or cumulative that the error simply could not reasonably said to have substantially swayed the jury's

22  judgment, the error is not harmful.

23         Here, the evidence that Petitioner was the individual who shot and killed the victim was

24  considerable: witnesses identified Petitioner as one of the group of individuals who, while wearing

25  gang-colored bandannas that covered their faces from the nose down, approached the victim.

26  Witnesses at trial identified Petitioner as the shooter.  (RT 207-211; 222-225; 227-235; 239-245; 247-

27  249).  The former girlfriend of one of the co-defendant's testified that Petitioner confessed that he shot

28  the victim because he was "dissing the hood" and that, several weeks prior to the murder, Petitioner

had told another gang member not to worry about the victim because Petitioner was going to take care of him.  (RT 250-251; 387-392).  Moreover, the handgun used to kill the victim was found in Petitioner's bedroom.  (RT 383; 434-440; 519-533).  Finally, the gang evidence presented at trial established both the gang's violent criminal methodology, including protecting its own "turf," as well as Petitioner's participation in the gang itself, and the victim was identified as a member of a rival gang.  Petitioner has not presented any substantive reason why the dismissal of juror no. 9 was in any way improper or prejudicial to him.  Under all of these circumstances, the state court's dismissal of juror no. 9 could not reasonably be said to have swayed the jury's judgment, and thus, any error was harmless.  Brecht, 507 U.S. at 623. Accordingly, this claim should be rejected.

  B.  Introduction Of Excessive Gang Evidence Denied Petitioner A Fair Trial.

Petitioner next contends that the state court's admission of voluminous gang evidence denied Petitioner his right to a fair trial.  Again, this contention lacks merit.

  1.  The 5th DCA's Opinion.

The 5th DCA denied Petitioner's claims as follows:

The prosecutor introduced evidence of the following predicate crimes to establish the gang allegations and substantive gang offense:

(1) On June 30, 2004, OT members approached an ice cream truck and took some ice cream without paying. When the truck owner demanded payment, one OT member went around the corner, put a blue bandanna over his face, came back, and fired multiple gunshots at the truck. The shooter was convicted of attempted murder with a gang enhancement.

(2) Also on June 30, 2004, an OT member and Aitang went into a convenience store and took beer without paying for it. When the security guard tried to stop them, the OT member turned and opened fire on the guard. The shooter was convicted of robbery and attempted murder with a street gang enhancement. A juvenile petition against Aitang for robbery with a gang enhancement was sustained.

(3) Also on June 30, 2004, Aitang was arrested for attempting to rob a person of his bicycle. A juvenile petition was sustained against Aitang for attempted robbery with a gang enhancement.

(4) On November 15, 2004, an OT member was involved in a verbal conflict over turf with a Norteno gang member. The OT member shot and killed the Norteno member, and was convicted of murder with a criminal street gang enhancement.

16

(5) On March 10, 2005, police contacted Chawa regarding a vehicular burglary and theft of the car stereo. Chawa was with another OT member at the time. A juvenile petition against Chawa for vehicular burglary was sustained.

(6) On April 6, 2005, Chawa was involved in a verbal altercation in which he threatened to shoot his ex-girlfriend's family. During the altercation, he identified himself as a person "who associates with ... gangs." A juvenile petition against Chawa for making a criminal threat was sustained.

(7) On April 30, 2005, OT members approached a Norteno gang member. One OT member then shot and killed the Norteno. The OT gang member pled guilty to manslaughter with a criminal street gang enhancement.

(8) On December 20, 2005, police conducted a probation search of Chawa's bedroom and found a handgun. Lavang was present, but Chawa was not. A juvenile petition against Chawa for being a minor in possession of a handgun was sustained.

(9) On May 8, 2006, an OT member was involved in a conflict over turf with a 15-year-old girl wearing a red shirt. The gang member fired a shot at the girl, missing her, but killing her older sister. The OT gang member was convicted of murder with a criminal street gang enhancement.

(10)    On an unspecified date, OT and Norteno gang members were involved in a verbal and physical altercation in a convenience store. An OT member shot and paralyzed a Norteno member. The OT member was convicted of assault with a firearm, mayhem, and shooting into a building, all with criminal street gang enhancements.

The prosecution also introduced the following field contacts:

(1) On March 10, 2005, Chawa was booked into juvenile hall wearing blue shoes.

(2) On April 7, 2005, Chawa was booked into juvenile hall wearing a blue sweater.

(3) On May 3, 2005, in response to a report of a family disturbance, officers spoke with Chawa, who was wearing a blue shirt and admitted being a Crip.

(4) On May 7, 2005, an officer contacted Chawa and found he had a blue bandanna. Chawa denied being a Crip, but stated he did "have Lahu pride."

(5) On October 18, 2006, when booked at juvenile hall, Chawa admitted being an OT member. He had gang-related tattoos on his hand.

(6) On December 12, 2007, Chawa, recaptured after escape, claimed he was an OT member.

17

(7) On August 30, 2005, police contacted Lavang about a petty theft. Lavang was with an OT member at the time.

(8) On November 8, 2005, an officer responded to a 911 call and noted Lavang and other OT members were present.

(9) On December 1, 2003, an officer contacted Lavang about gang graffiti on his books. He was wearing a blue shirt and admitted being a LPC member.

(10)   On January 30, 2006, an officer contacted Lavang. He was wearing a blue sweater and shorts and admitted being an OT member.

(11)   On October 17, 2006, when booked on the current offense, Lavang claimed OT membership.

(12)   On December 12, 2007, Lavang, recaptured after escape, claimed he was an OT member. (See fn. 4 on p. 8, ante.)

(13)   On February 6, 2008, when Lavang turned 18 and was transferred to county jail, he filled out a questionnaire in which he claimed OT membership.

(14)   On January 8, 2004, a detective contacted Aitang as a suspect in an armed robbery.

(15)   On January 15, 2004, an officer stopped Aitang, who was riding a bike at the time. Aitang admitted writing "LPC" on his bicycle and being an LPC member.

(16)   On February 3, 2004, an officer contacted Aitang at school. He admitted being a LPC gang member and had five dots tattooed on his left hand.

(17)   On February 9, 2004, a detective contacted Aitang, who was a passenger in a stolen vehicle. He was wearing a blue hat and a blue jersey and was in the company of two other OT members.

(18)   On April 9, 2004, an officer contacted Aitang, who was wearing a blue and white shirt. He was in the company of other known OT members and admitted being an LPC.

(19)   On May 10, 2004, an officer contacted Aitang in the home of another OT member. The officer was responding to a call of fired shots.

(20)   On May 26, 2004, an officer contacted Aitang, who was in the company of two other OT members. Aitang had a blue bandanna and admitting having been an LPC for one year.

18

(21)    On June 11, 2004, a probation officer contact Aitang, who was in the company of another OT member. Aitang was wearing a blue shirt, had a blue bandanna, and admitted being an LPC.

(22)    On July 1, 2204, an officer contacted Aitang, who was in the company of an OT member. Aitang was wearing a blue shirt.

(23)    On December 30, 2004, when booked into juvenile hall, Aitang was wearing a blue shirt and blue shorts.

(24)    On October 6, 2006, when booked at juvenile hall, Aitang admitted Crip gang affiliation.

(25)    On December 12, 2007, Aitang, when recaptured after escape, claimed OT membership. (See fn. 4 on p. 8, ante.)

Appellants contend the predicate offenses and field contacts admitted in proving the existence of a criminal street gang and appellants' active participation in the gang, for purposes of section 186, subdivision (b)(1)(C) and section 190.2, subdivision (a)(22), were unnecessarily cumulative and unduly prejudicial. In addition, Chawa specifically contests the admission of his prior juvenile adjudications for criminal threat and possession of a handgun (predicate offenses Nos. 6 and 8, ante) into evidence.

The People argue that appellants failed to timely object in the trial court to the evidence about which they now complain, with the exception of Chawa's juvenile adjudications for criminal threat and minor in possession of a handgun, and therefore have forfeited their objections. Because appellants argue ineffective assistance of counsel in the alternative, should we find waiver, we address the issue on the merits and find no prejudicial error.

**a.  Standard of Review**

The trial court has discretion in determining the admissibility of evidence, and on appeal we find reversible error only if the trial court's exercise of its discretion was arbitrary, capricious, or patently absurd resulting in a manifest miscarriage of justice. (People v. Ochoa (2001) 26 Cal.4th 398, 437-438, abrogated on another point as stated in People v. Prieto (2003) 30 Cal.4th 226, 263, fn. 14.)

**b.  Gang Evidence**

In order to subject appellants to gang-related sentence enhancements under section 186.22, subdivision (b)(1), the prosecution was required to prove that the crime for which appellants were convicted was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members...." In order to prove the section 190.2, subdivision (a)(22) allegation, the prosecutor had to show that the appellants intentionally killed the victim while each was "an active participant in a criminal street gang ... and the murder was carried out to further the activities of the criminal street gang." A "criminal street gang" means "any ongoing

organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of [certain specified crimes], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in the gang statute." (People v. Sengpadychith (2001) 26 Cal.4th 316, 324, italics in the original.) And a "pattern of criminal gang activity" is defined as participation in two or more statutorily enumerated criminal offenses (the predicate offenses) that are committed within a statutorily defined period and "on separate occasions, or by two or more persons." (§ 186.22, subd. (e).) "[A] pattern can be established by two or more incidents, each with a single perpetrator, or by a single incident with multiple participants committing one or more of the specified offenses." (In re Nathaniel C. (1991) 228 Cal.App.3d 990, 1003.)

Gang evidence, including expert testimony, is admissible to prove the elements of the substantive gang crime and gang enhancements if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. (People v. Avitia (2005) 127 Cal.App.4th 185, 192.) Thus, a properly qualified gang expert may testify about a wide range of issues, including a gang's territory, retaliation, graffiti, hand signals, tattoos, and clothing. (People v. Ochoa, supra, 26 Cal.4th at pp. 438-439.)

As noted above, the prosecutor introduced evidence of at least 10 crimes committed by OT members, as well as numerous field contacts with appellants, and in argument to the jury the prosecutor referred to several of these incidents. We are unaware of any authority in which the court directly addressed the volume of evidence that may be introduced to establish the primary activities, predicate crimes, and active participation elements of a gang enhancement or gang charge. But any such evidence must be subject to scrutiny under Evidence Code section 352,5 under which we determine whether the evidence is cumulative and unduly prejudicial.

**c.   Cumulative Evidence**

Courts have recognized that evidence of other crimes may be extremely inflammatory, and the trial court must take great care to evaluate its admissibility. (People v. Albarran (2007) 149 Cal.App.4th 214, 223.) Even if the evidence is relevant, the trial court must carefully scrutinize gang-related evidence before admitting it because of its potentially inflammatory impact on the jury. (Ibid.) The trial court must find that the evidence has substantial probative value that is not outweighed by its potential for undue prejudice. (Evid.Code, § 352; People v. Ewoldt (1994) 7 Cal.4th 380, 404.)

Appellant contends that the volume of predicate offenses and field contacts admitted here were cumulative and unduly prejudicial. In People v. Leon (2008) 161 Cal.App.4th 149, on which appellants rely, the defendant was convicted of burglary, attempting to dissuade a witness from reporting a crime, possessing a concealed firearm in a vehicle while being an active participant in a criminal street gang, and carrying a loaded firearm while being an active participant in a criminal street gang. (Id. at p. 152.) During trial, the court permitted the prosecutor to introduce

evidence of the defendant's 1999 juvenile adjudication for robbery for the purpose of establishing the predicate offenses necessary to establish the section 186.22, subdivision (b)(1) gang enhancement. (Id. at pp. 164-165.)

On appeal, the court held that the trial court abused its discretion in admitting evidence of the defendant's prior juvenile robbery adjudication to establish both that the defendant was a gang member and that the group in question was a criminal gang. The court noted that the robbery convictions of other gang members were sufficient to establish the predicate offenses, and the evidence of the defendant's gang membership was overwhelming. (People v. Leon, supra, 161 Cal.App.4th at p. 169.) Thus, the court held "the evidence of [the defendant's] robbery adjudication was 'merely cumulative regarding an issue that was not reasonably subject to dispute.' [Citation.]" (Ibid.) But the court found the error harmless nonetheless. (Id. at pp. 169-170.)

Appellants also rely on People v. Williams (2009) 170 Cal.App.4th 587, in which police executed a search warrant on a house and found a gun, drug paraphernalia and ammunition in a bedroom and a second gun and drug paraphernalia in the garage. There were seven gang members present at the time, including the defendant. (Id. at pp. 596-597.) The defendant was convicted of gun and drug charges with gang enhancements and participation in a criminal street gang. (Id. at p. 595.)

On appeal, the court found that the trial court abused its discretion in admitting evidence of "at least eight crimes committed by [gang] members," as well as evidence and of dozens of police/gang contacts. (People v. Williams, supra, 170 Cal.App.4th at pp. 600-602, 609.) The court found the evidence "cumulative" because it "concern[ed] issues not reasonably subject to dispute." (Id. at p. 611.) It nonetheless found introduction of the cumulative gang evidence harmless. (Id. at pp. 612-613.)

Here, the admitted gang evidence and field contacts were numerous. The prosecution introduced five predicate offenses not involving appellants. In addition, one predicate offense involved another gang member and Aitang; one offense involved Aitang alone; and three predicate offenses involved Chawa, although Lavang was present on one of those occasions. In addition to the predicate offenses, the prosecutor introduced evidence of numerous field contacts with appellant. And while appellants seem to concede that admission of gang membership and the wearing of gang colors when contacted by officers indicated active gang participation, they argue that many of the incidents revealed that police contacted the appellants because they were suspects or participants in other offenses or were booked into juvenile hall-irrelevant and unduly prejudicial acts.

As stated in People v. Williams, supra, 170 Cal.App.4th at page 611, "Although no bright-line rules exist for determining when evidence is cumulative, ... application of the term must be reasonable and practical." But here, even assuming arguendo that it was an abuse of discretion to admit cumulative evidence on issues not reasonably subject to dispute, we next evaluate whether the introduction of the cumulative gang evidence was prejudicial error.

**d.  Harmless Error**

We evaluate error in the admission of prior crimes evidence using the standard of People v. Watson (1956) 46 Cal.2d 818, 836 (Watson), under which we determine whether it was "reasonably probable that a result more favorable to defendant would have resulted" had the prior crimes evidence not been admitted. (People v. Welch (1999) 20 Cal.4th 701, 750.) But appellants contend that the erroneous admission of evidence rendered the trial fundamentally unfair, and therefore we should review the error under the harmless-beyond-a-reasonable-doubt test set forth in Chapman v.. California (1967) 386 U.S. 18, 23-24.)

Relying on People v. Albarran, supra, 149 Cal.App.4th 214, appellants argue the introduction of gang evidence violated their due process right and led to a fundamentally unfair trial. In Albarran, the court held that there was nothing inherent in the facts of the charged shooting to suggest any gang motive and the gang evidence was highly prejudicial, and the court found defendant's federal due process rights had been violated. (Id. at pp. 227, 230-232.) The court stated, however, that the case before it "present[ed] one of those rare and unusual occasions" where the error was of federal constitutional dimension. (Id. at p. 232.) The court explained, " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.]" (Id. at p. 229.)

Here, in contrast, the challenged evidence had direct relevance to and was directly probative of the gang enhancements to establish the predicate offenses and appellants' continuing participation in the gang. There was overwhelming evidence of appellants' guilt of Trevino's murder. Witnesses identified appellants as the males who, while wearing gang-colored bandannas, approached Trevino. Lavang admitted being present during the murder. Chawa was identified as the shooter. Chawa told Lavang's former girlfriend that he shot Trevino because he was "dissing the hood," and the weapon used to kill Trevino was later found in Chawa's bedroom. Ample admissible evidence established appellants' prior and current involvement with the OT gang; all three admitted OT gang membership. We conclude that any error in admitting cumulative gang evidence was harmless under either Watson or Chapman.

(LD 1, pp. 6-18).

2.   Analysis.

First, as Respondent correctly argues, the United States Supreme Court has expressly left open the question of whether the admission of propensity evidence violates due process.  See  Estelle v. McGuire, 502 U.S. at 75, n. 5; see Holgerson v. Knowles, 309 F.3d 1200, 1202 (9th Cir.2002) (habeas relief not warranted unless due process violation clearly established by the Supreme Court); Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001), *reversed on other grounds*, Woodford v. Garceau, 538 U.S. 202 (2003)(the Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith....").  In this regard, in Holley v. Yarborough, 568 F.3d 1091 (9th Cir. 2009), the Ninth Circuit explained as follows:

22

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ [of habeas corpus] should be issued when constitutional errors have rendered the trial fundamentally unfair [Citations], it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

Holley, 568 F.3d at 1101.

Hence, the state courts' rejection of Petitioner's claim *could not* have been "contrary to, or an unreasonable application of, clearly established" United States Supreme Court authority, since no such "clearly established" Supreme Court authority exists.  28 U.S.C. § 2254(d)(1).

Second, Petitioner's claim would normally sound only in state law and, therefore, would not be cognizable in federal habeas proceedings. A federal habeas corpus court has no authority to review a state's application of its own laws, but rather must determine whether a prisoner's constitutional or other federal rights have been violated.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Jackson v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990).  Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding.  Estelle, 502 U.S. at 67; Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.), *cert. denied,* 478 U.S. 1021 (1985).

Nevertheless, there can be habeas relief for the admission of prejudicial evidence if the admission was fundamentally unfair and resulted in a denial of due process.  Estelle, 502 U.S. at 72; Pulley v. Harris, 465 U.S. 37, 41 (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state rules of evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation.  Id. at 920.  Intent is a permissible inference that the jury may draw from the evidence of prior bad acts.  See, Houston v. Roe, 177 F.3d 901, 910 n. 6 (9th Cir. 1999).  Here, Petitioner has failed to show that no permissible inferences existed that the jury might draw from the challenged evidence; accordingly, it does not rise to the level of a federal claim and is, therefore, simply an issue of state law.

Here, the state court concluded that permissible inferences existed for the challenged evidence because the evidence was relevant and probative of the various elements of the gang enhancements with which Petitioner was charged. As the 5th DCA pointed out, under California law, the gang-related sentence enhancement under § 186.22(b)(1) required proof that the crime for which Petitioner was convicted was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members…." Cal. Pen. Code § 186.22(b)(1). In order to prove the other gang-related enhancement, the prosecution had to establish that Petitioner intentionally killed the victim while "an active participant in a criminal street gang…and the murder was carried out to further the activities of the criminal street gang." Cal. Pen. Code § 190.2(a)(22). Even a cursory review of the gang-related evidence cited by the 5th DCA shows that each episode was relevant to establishing one or both of the above-referenced enhancements. Accordingly, all of the gang-related evidence was susceptible to legitimate inferences by the jury regarding the elements of the enhancements for which the jurors were tasked with returning a verdict.

Thus, the only viable remaining issue is whether the sheer multiplicity of evidence, i.e., its tendency to be cumulative, unfairly prejudiced Petitioner's case. In his Traverse, Petitioner argues that much of the evidence should have been excluded by California law where the prejudicial effect of the evidence outweighs its probative value. (Doc. 16, p. 19). The Court, however, agrees with the 5th DCA in this regard that any error was harmless. As discussed in the previous section, the evidence of Petitioner's guilt was considerable, both in quantity and quality. Forensic evidence, eyewitness testimony, and witnesses subsequent to the shooting, all supported the prosecution's theory that Petitioner killed the victim. On the other hand, exculpatory evidence was virtually nonexistent. Under such circumstances, the challenged gang-related evidence, even if found to be unnecessarily cumulative, could not reasonably be said to have swayed the jury's judgment. Hence, the error, if any, was harmless. Brecht, 507 U.S. at 623. Accordingly, this claim should be denied.

C. Petitioner's Sentence Was Cruel And Unusual.

Finally, Petitioner contends that his sentence of life without the possibility of parole violates the Eighth Amendment's prohibition against cruel and unusual punishment. The Court disagrees.

24

1    1. The 5th DCA's Decision.

2 The 5th DCA rejected Petitioner's contention as follows:

3 Lavang and Chawa argue that, because they are minors, their sentences of life without
possibility of parole are cruel and/or unusual punishment under the United States and

4 California Constitutions, as well as under an international treaty ratified by the United States.
Chawa and Lavang also contend that the trial court abused its discretion in imposing the

5 sentences. We disagree.

6 Lavang and Chawa were both convicted of special circumstance first degree murder, pursuant

7 to section 190.2, subdivision (a)(22). The parties stipulated that, at the time of the offense,
Chawa and Lavang were both 16 years old.

8

9 Section 190.5, subdivision (b) provides, in pertinent part, that the punishment for a defendant
convicted of murder in the first degree with one or more special circumstances, "who was 16

10 years of age or older and under the age of 18 years at the time of the commission of the crime,
shall be confinement in the state prison for life without the possibility of parole or, at the

11 discretion of the court, 25 years to life." While the "presumptive" or "preferred" penalty in
section 190.5, subdivision (b) is life without the possibility of parole, the statue does require "

12 'a proper exercise of discretion in choosing whether to grant leniency and impose the lesser
penalty of 25 years to life for 16- or 17-year-old special circumstance murderers.' " (People v.

13 Ybarra (2008) 166 Cal.App.4th 1069, 1089.)

14

15 In denying Lavang and Chawa leniency, the trial court, after reviewing the probation reports,
stated:

16

17   "The Court notes that this crime did involve great callousness. This was done in the
   middle of the day very brazenly with masks over their faces as they walked down the

18   street, making a statement essentially to all that observed what they were doing. The
   manner in which the crime was carried out indicates planning, sophistication, and

19   professionalism, in the Court's opinion. The defendants each have engaged in violent
   conduct which indicates a serious danger to society. [¶] The Court notes there are a

20   couple of mitigating factors. However, the Court does not feel that they in any way
   outweigh the aggravating factors in this case. [¶] The Court has considered its

21   discretion in giving a 25-years-to-life sentence and because of the sophistication and
   the manner in which this crime was carried out has specifically decided against it."

22

23 "Cruel and unusual punishment is prohibited by the Eighth Amendment to the United States
Constitution and article I, section 17 of the California constitution. Punishment is cruel and

24 unusual if it is so disproportionate to the crime committed that it shocks the conscience and
offends fundamental notions of human dignity." (People v. Mantanez (2002) 98 Cal.App.4th

25 354, 358, fns. omitted.)

26

27 Chawa and Lavang's argument is based on the fact that they were 16 at the time of the
homicide and, in Lavang's case, had no prior criminal history. Chawa and Lavang rely on

28 Roper v. Simmons (2005) 543 U.S. 551, 569-575 (Roper ), which holds that the death penalty

is excessive punishment when imposed on a person who was under 18 when the underlying crime was committed. An earlier case, Thompson v. Oklahoma (1988) 487 U.S. 815, 823 (Thompson ), reached the same conclusion with respect to minors under 16.

Here, however, we are not concerned with the death penalty. "Proportionality review is one of several respects in which [the Supreme court has] held that 'death is different,' and ha[s] imposed protections that the Constitution nowhere else provides. [Citations .]" (Harmelin v. Michigan (1991) 501 U.S. 957, 994 [lead opn. of Scalia, J.]; see also Ring v. Arizona (2002) 536 U.S. 584, 606 [" '[d]eath is different' ".].)

Chawa and Lavang do not cite any United States Supreme Court or California authority holding that life imprisonment is constitutionally excessive, irrespective of other circumstances, where special circumstance murder is committed by a 16-year-old juvenile. Certainly, the viciousness and circumstances of the crime must be considered before any assessment of punishment.

In People v. Demirdjian (2006) 144 Cal.App.4th 10, the court held that it was not cruel and unusual punishment to impose an indeterminate life term without the possibility of parole (LWOP) on a person who was 15 years old when he committed the crimes-two first degree murders with special circumstances. (Id. at pp. 13-16.) Demirdjian cited People v. Guinn (1994) 28 Cal.App.4th 1130, which had earlier come to virtually the same conclusion, except that there, the defendant had been convicted of only one murder. (People v. Demirdjian, supra, 144 Cal.App.4th at p. 16.) In Guinn, the court stated:

> "[¶] Defendant Guinn argues that imposition of a sentence of LWOP on a 17-year-old is extreme. While we agree that the punishment is very severe, the People of the State of California in enacting the provision have made a legislative choice that some 16- and 17-year-olds, who are tried as adults, and who commit the adult crime of special circumstance murder, are presumptively to be punished with LWOP. We are unwilling to hold that such a legislative choice is necessarily too extreme, given the social reality of the many horrendous crimes, committed by increasingly vicious youthful offenders, which undoubtedly spurred the enactment." (People v. Guinn, supra, 28 Cal.App.4th at p. 1147; see also People v. Gonzales (2001) 87 Cal.App.4th 1, 17 [sentencing a 14 year old to 50 years to life was not cruel and unusual punishment]; Harris v. Wright (9th Cir.1996) 93 F.3d 581, 583-584 [sentencing a 15 year old to life without parole was not cruel and unusual punishment].)

Chawa and Lavang do not attempt to distinguish Guinn or Demirdjian, but instead claim that they, or at least Lavang, are less culpable than the defendant in People v. Dillon (1983) 34 Cal.3d 441. We disagree. In Dillon, the defendant, a 17-year-old boy, was convicted of felony-murder and sentenced to life with the possibility of parole. The defendant had gone with accomplices to a field to steal marijuana. A cohort accidentally fired a shot and alerted the owner to their presence. The defendant then shot the owner nine times, killing him. (Id. at p. 487.) As explained in Guinn, the court reduced the murder conviction in Dillon to second-degree murder, because the defendant, a 17-year-old boy, shot a man he thought had shot his friends and was about to shoot him; he had no prior record; and the jury had expressed

reluctance to convict him of first degree murder. (<u>People v. Guinn, supra</u>, 28 Cal.App.4th at p. 1146.)

While Lavang and Chawa were young and Lavang had no prior criminal record, they are not similar in any other respects to the defendant in <u>Dillon</u>. The circumstances in this case are callous and brazen. Appellants, acting in concert, approached a 16 year old playing football with other neighborhood children in the middle of the day. The victim did nothing to provoke appellants' attack, a deadly shot to the head. Chawa and Lavang wore masks, identifying them as gang members, and participated in the crime for the benefit of a criminal street gang. "The fact that defendant ... had chosen to embrace an antisocial, savage, gang lifestyle of complete heinousness, callousness and utter disregard for the law or for the rights of others at a relatively early age does not demonstrate the disproportionality of the sentence. The senselessness of defendant['s] ... crimes makes them more, rather than less, deserving of punishment." (<u>People v. Guinn, supra</u>, 28 Cal.App.4th at p. 1146.)

Lastly, Chawa and Lavang argue the imposition of a life sentence without the possibility of parole violates international law. They cite articles 7, 10 and 24 of the United Nations' International Covenant on Civil and Political Rights (ICCPR), an international treaty ratified by the United States in 1966. Even if Chawa and Lavang have standing to personally invoke the provisions of the ICCPR, a plain reading of the ICCPR does not support Chawa and Lavang's contention. While the ICCPR's juvenile provisions (1) emphasize the rehabilitation and education of juveniles; (2) require separation of child offenders from adults; and (3) require that the provisions of treatment be appropriate to the child's age, upon ratifying the ICCPR the United States Senate attached the following limiting reservation:

> "(5) That the policy and practice of the United States are generally in compliance with and supportive of the [ICCPR's] provisions regarding treatment of juveniles in the criminal justice system. Nevertheless, the United States reserves the right, in exceptional circumstances, to treat juveniles as adults, notwithstanding paragraphs 2(b) and 3 of Article 10 and paragraph 4 of Article 14.... See 138 Cong. Rec. S4781-01 (daily ed. April 2, 1992)...." <u>Graham v. State</u> (2008) 982 So.2d 43, 53, emphasis omitted.)

As explained further in <u>Graham v. State, supra</u>, in which the juvenile defendant sentenced to life without the possibility of parole made a similar claim to that made by Chawa and Lavang:

> "The ICCPR was ratified subject to a declaration of non-execution. <u>See</u> 138 Cong. Rec. S4781-01. As such, appellant has no judicially enforceable right directly arising out of a challenge to the ICCPR as it would be interpreted by its signatory nations; his argument can attack only the breadth of United States law implementing the treaty. <u>Pierre v. Gonzales</u> 502 F.3d 109 (2d Cir.2007). This case does not involve such an attack. Until the treaty is implemented th[r]ough congressional action, it cannot act as a limitation on the power of the Florida Legislature to determine the appropriate penalties for violations of the law. <u>Medellin v. Texas</u> [ (2008) 552 U.S. 491], 128 S.Ct. 1346, 1354-57 ... (reaffirming that non-self-executing ratifications of international treaties cannot act as a limit on state power unless legislation exists implementing the treaty)." (<u>Graham v. State, supra</u>, 982 So.2d at p. 54.)

For the foregoing reasons, we find the trial court did not abuse its discretion when it chose to send Chawa and Lavang to prison for the term of life without the possibility of parole, the sentence did not violate the state or federal constitutional prohibitions against excessive punishment, and the sentence did not violate the ICCPR.

(LD 1, pp. 25-29).

2.   Analysis.

The United States Supreme Court has held that the Eighth Amendment includes a "narrow proportionality principle" that applies to terms of imprisonment.  See Harmelin v. Michigan, 501 U.S. 957, 996, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring). See also Taylor v. Lewis, 460 F.3d 1093, 1097 (9th Cir. 2006).  However, successful challenges in federal court to the proportionality of particular sentences are "exceedingly rare."  Solem v. Helm, 463 U.S. 277, 289–90, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). See also Ramirez v. Castro, 365 F.3d 755, 775 (9th Cir.2004). "The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime."  Harmelin, 501 U.S. at 1001 (Kennedy, J., concurring) (citing Solem v. Helm).

In assessing the compliance of a non-capital sentence with the proportionality principle, a reviewing court must consider "objective factors" to the extent possible. Solem, 463 U.S. at 290. Foremost among these factors are the severity of the penalty imposed and the gravity of the offense. "Comparisons among offenses can be made in light of, among other things, the harm caused or threatened to the victim or society, the culpability of the offender, and the absolute magnitude of the crime." Taylor, 460 F.3d at 1098.

More recently, in Graham v. Florida, __U.S.__, 130 S.Ct. 2011 (2010), the United States Supreme Court held that a sentence of life without the possibility of parole constitutes cruel and unusual punishment when imposed for a non-homicide committed by a minor under the age of eighteen. Graham, 130 S.Ct. at 2034.  However, as Respondent correctly points out, the U.S. Supreme Court has not indicated that the federal constitution requires a more lenient sentence where, as here, someone under the age of eighteen actually committed homicide.  See, e.g., Silas v. Pennsylvania, 2011 WL 439973 at *2 (E.D. Pa. 2011)(Graham not applicable to petitioner who committed murder);

28

1    <u>Williams v. Ryan</u>, 2010 WL 3768151 at *30 (S.D. Ca. 2010)(same).  To the contrary, the Supreme

2    Court in <u>Graham</u> noted that

> "[j]uvenile offenders who committed both homicide and nonhomicide crimes present a different situation for a sentencing judge than juvenile offenders who committed no homicide. It is difficult to say that a defendant who receives a life sentence on a nonhomicide offense but who was at the same time convicted of homicide is not in some sense being punished in part for the homicide when the judge makes the sentencing determination."

7    130 S.Ct. at 2023.  Thus, it appears as if the Supreme Court has, at least tacitly, recognized that life

8    without parole for a juvenile who has committed homicide does not violate the Eighth Amendment.

9            In this same vein, the Ninth Circuit, in <u>Harris v. Wright</u>, 93 F.3d 581, 585 (9th Cir.1996), made

10   the following insightful observation:

> [C]apital punishment aside, there's no constitutional (or rational) basis for classifying punishment in distinct, ordinal categories. As the Supreme Court noted in <u>Harmelin</u>, 501 U.S. at 996, 111 S.Ct. 2702, if we put mandatory life imprisonment without parole into a unique constitutional category, we'll be hard pressed to distinguish mandatory life with parole; the latter is nearly indistinguishable from a very long, mandatory term of years; and that, in turn, is hard to distinguish from shorter terms. Youth has no obvious bearing on this problem: If we can discern no clear line for adults, neither can we for youths. Accordingly, while capital punishment is unique and must be treated specially, mandatory life imprisonment without parole is, for young and old alike, only an outlying point on the continuum of prison sentences. <u>See id</u>. at 995–96, 111 S.Ct. at 2701–02. Like any other prison sentence, it raises no inference of disproportionality when imposed on a murderer.

17          A petitioner's claim is always governed by the relevant U. S. Supreme Court authority clearly

18   established at the time the relevant state court decision became final. <u>Williams</u>, 529 U.S. at 390; <u>see</u>

19   <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 661, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). The decision of

20   the California Court of Appeal in this case became final on March 30, 2010 (LD 2), the date the

21   California Supreme Court denied the petition for review, which was prior to the Supreme Court's May

22   17, 2010 decision in <u>Graham v. Florida</u>, 560 U.S. ——, 130 S.Ct. 2011, 176 L.Ed.2d 825, 175 L.Ed.

23   825 (2010), which "settled on an authoritative answer to how reviewing courts should apply the

24   [Eighth Amendment's] proportionality principle to non-capital cases." <u>Norris v. Morgan</u>, 622 F.3d

25   1276, 1287 n. 12 (9th Cir.2010).  Therefore, Petitioner's claim is governed by pre-<u>Graham</u> principles

26   as set forth in <u>Ewing v. California</u>, 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003), and <u>Lockyer</u>

27

28

v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). See Norris, 622 F.3d at 1287.[1]

The Eight Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines be imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The last clause "prohibits not only barbaric punishments," Solem v. Helm, 463 U.S. 277, 284, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), but any "extreme sentence[ ] that [is] 'grossly disproportionate to the crime.' " Ewing, 538 U.S. at 23 (quoting Harmelin v. Michigan, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment)). Prior to Graham, there was "no agreement on the proper approach to proportionality review." Norris, 622 F.3d at 1286 (citations omitted). And, therefore, "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' [AEDPA] framework is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme case.'" Andrade, 538 U.S. at 73 (citations omitted).

This case, however, is not that exceedingly rare and extreme case to which the Supreme Court was referring. Under normal circumstances, a sentence of life imprisonment for the crimes of first degree murder and attempted murder would not raise an eyebrow. Indeed, life in prison is a common sentence for those found guilty of first degree murder. See, e.g., Cal.Penal Code § 190 (25 years to life lowest possible sentence for first degree murder); Mich. Comp. Laws 750.316 (life in prison for first degree murder); Wyo. Stat. Ann. § 6–2–101 (same). What makes this case different, from Petitioner's perspective, is his relatively young age at the time of the underlying offenses, i.e., 16 years of age.

The Supreme Court has had more than one occasion to discuss the outer limits on the punishment of juveniles. See Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988); Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005); Graham, —— U.S. ——, 130 S.Ct. 2011, 176 L.Ed.2d 825. In Thompson v. Oklahoma, a plurality of the Supreme Court found that sentencing a juvenile less than sixteen years old to death violated the Eighth Amendment because "such a young person is not capable of acting with the degree of culpability that can justify the ultimate penalty." 487 U .S. at 823 (footnote omitted). Seventeen years later, in 2005, the Court

---

[1] Nothing in the record, however, suggests that the Court's determination of this issue would be altered in any way if post-Graham principles were applied instead.

expanded this reasoning to include all minors, those who are less than eighteen years of age. Roper, 543 U.S. at 574, abrogating Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) ("The logic of Thompson extends to those who are under 18.... It is, we conclude, the age at which the line for death eligibility ought to rest."). In a case decided two years after the California Court of Appeal reached its determination on Petitioner's appeal, and therefore not part of the clearly established law available to the appellate court, see Williams, 529 U.S. at 412, the Supreme Court determined that sentencing juveniles to life in prison without the possibility of parole for crimes other than murder violated the Eighth Amendment. Graham, 130 S.Ct. at 2030.

These cases, taken together, show that the Supreme Court has determined that applying the death penalty to juveniles, or sentencing them to life in prison without the possibility of parole for crimes other than murder, is impermissible. They also show, however, that there is no clearly established federal law, as determined by the Supreme Court of the United States, which would prohibit sentencing a juvenile to life in prison for murder. In Romer, the Supreme Court did not find fault with the Missouri Supreme Court's decision to resentence the juvenile to life in prison without the possibility of parole. 543 U.S. at 560. Indeed, in dicta, the Court tacitly accepted that life in prison was an appropriate punishment:

> To the extent the juvenile death penalty might have residual deterrent effect, it is worth noting that the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person.

Id. at 572.  In Harris v. Wright, 93 F.3d 581 (9th Cir.1996), the Ninth Circuit explicitly upheld the sentence of life in prison without the possibility of parole for a fifteen-year-old who had been found guilty of first degree murder. Id. at 585 ("there's no evidence of a consensus against mandatory life without parole for fifteen-year-olds, and we don't subject life imprisonment without parole to the same searching scrutiny we apply to capital punishment" (citing Harmelin, 501 U.S. at 944–45)). The Ninth Circuit relied on the Supreme Court's reasoning in Harmelin that a mandatory sentence of life in prison without the possibility of parole was distinguishable from a death sentence and did not warrant special Eighth Amendment scrutiny. Harmelin, 501 U.S. at 995–96 ("We have drawn the line of required individualized sentencing at capital cases, and see no basis for extending it further."); Harris,

93 F.3d at 585 ("[W]hile capital punishment is unique and must be treated specially, mandatory life imprisonment without parole is, for young and old alike, only an outlying point on the continuum of prison sentences." (citation omitted)).

Although the Supreme Court has subsequently decided that life imprisonment without the possibility of parole for a minor warrants special attention in circumstances other than murder convictions, see Graham, 130 S.Ct. at 2027, the Court has yet to squarely address the issue of sentencing a minor to life in prison upon a conviction for murder.  Indeed, in Graham, the Court did not rule out the punishment Petitioner received in this case, i.e., a life sentence without the possibility of parole, for juvenile homicide offenders. See, e.g., Silas v. Pennsylvania, 2011 WL 439973 at *2 (E.D. Pa. 2011)(Graham not applicable to petitioner who committed murder); Williams v. Ryan, 2010 WL 3768151 at *30 (S.D. Cal. 2010)(same). To the contrary, the Supreme Court in Graham noted that

> "[j]uvenile offenders who committed both homicide and nonhomicide crimes present a different situation for a sentencing judge than juvenile offenders who committed no homicide. It is difficult to say that a defendant who receives a life sentence on a nonhomicide offense but who was at the same time convicted of homicide is not in some sense being punished in part for the homicide when the judge makes the sentencing determination."

130 S.Ct. at 2023.

In this same vein, the Ninth Circuit, in Harris v. Wright, 93 F.3d 581, 585 (9th Cir.1996), made the following insightful observation:

> [C]apital punishment aside, there's no constitutional (or rational) basis for classifying punishment in distinct, ordinal categories. As the Supreme Court noted in Harmelin, 501 U.S. at 996, 111 S.Ct. 2702, if we put mandatory life imprisonment without parole into a unique constitutional category, we'll be hard pressed to distinguish mandatory life with parole; the latter is nearly indistinguishable from a very long, mandatory term of years; and that, in turn, is hard to distinguish from shorter terms. Youth has no obvious bearing on this problem: If we can discern no clear line for adults, neither can we for youths. Accordingly, while capital punishment is unique and must be treated specially, mandatory life imprisonment without parole is, for young and old alike, only an outlying point on the continuum of prison sentences. See id. at 995–96, 111 S.Ct. at 2701–02. Like any other prison sentence, it raises no inference of disproportionality when imposed on a murderer.

Harris, 93 F.3d at 585.

Based upon the foregoing authoritative case law from the U.S. Supreme Court and the Ninth Circuit, the Court concludes that the 5th DCA reached a reasonable conclusion when it determined

Petitioner's sentence of life without the possibility of parole did not violate the Eight Amendment's proscription of cruel and unusual punishment. Hence, Petitioner is not entitled to relief on this claim.

## **RECOMMENDATION**

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be DENIED with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within twenty (20) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

   Dated:   **March 26, 2013**                    **/s/ Jennifer L. Thurston**
                                                UNITED STATES MAGISTRATE JUDGE